NO. 14-1688

IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

SYED FARHAJ HASSAN; THE COUNCIL OF IMAMS IN NEW JERSEY;
MUSLIM STUDENTS ASSOCIATION OF THE U.S. AND CANADA, INC.; ALL
BODY SHOP INSIDE & OUTSIDE; UNITY BEEF SAUSAGE COMPANY;
MUSLIM FOUNDATION INC.; MOIZ MOHAMMED; JANE DOE; SOOFIA
TAHIR; ZAIMAH ABDUR-RAHIM; AND ABDUL-HAKIM ABDULLAH,

Plaintiffs-Appellants

-v.-

THE CITY OF NEW YORK

Defendant-Appellee.

Appeal from the Order of the United States District Court for the
District of New Jersey, filed on February 20, 2014
(Below: Civil Action No. 12-3401)
Before The Honorable William J. Martini, U.S.D.J.

BRIEF OF APPELLEE THE CITY OF NEW YORK

ZACHARY W. CARTER
Corporation Counsel
   of the City of New York
Attorney for Defendant-Appellee
100 Church Street
New York, New York 10007
(212) 356-3532

On the brief:
Peter G. Farrell
Celeste Koeleveld
Alexis Leist
Anthony DiSenso
William Oates
Cheryl Shammas
Odile Farrell

REPRODUCED ON RECYCLED PAPER

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................v

STATEMENT OF THE ISSUES...............................................................1

STATEMENT OF THE RELEVANT FACTS .........................................1

        A.    Allegations About "Surveillance" Of Muslims Generally...................................................2

        B.    Plaintiffs Do Not Allege Facts That Constitute "Surveillance"..............................................3

        C.    Plaintiffs' Alleged Injuries...........................................5

        D.    Alleged "Injuries" Occur Only After The Associated Press Releases Unredacted Documents...................................................6

        E.    No Violation of New Jersey Criminal or Civil Law...................................................................6

        F.    Procedural History .......................................................7

        G.    The Decision Below......................................................7

STATEMENT OF RELATED CASES AND PROCEEDINGS .............9

SUMMARY OF ARGUMENT .............................................................10

**Page**

ARGUMENT

     POINT I

          THE DISTRICT COURT PROPERLY FOUND THAT PLAINTIFFS LACK STANDING BECAUSE THEY HAVE NOT ALLEGED ANY CONCRETE AND PARTICULARIZED INJURY ............................................. 13

          A.    The Controlling Decision in *Laird v. Tatum* Demonstrates that Plaintiffs Have Not Sufficiently Alleged Injury-in-Fact. .................... 14

                1.    *Laird* rejected highly similar surveillance-related allegations as insufficient to confer standing. ........................................ 14

                2.    Plaintiffs fail to successfully distinguish *Laird*. ...................................... 17

          B.    Plaintiffs' Various Allegations of Injury All Fail Because The Alleged Harms Are Not Concrete, Particularized, or Imminent. .................................................................. 20

                1.    Plaintiffs' alleged injuries based on their own subjective fears are insufficient to confer standing. ..................................................... 20

**Page**

    2.    Plaintiffs' contentions that
          they will suffer future
          harms—as            yet
          unrealized—based       on
          others' reactions to the
          disclosures        about
          surveillance are purely
          speculative...................................................23

    3.    The limited allegations of
          business-related injury by
          three      plaintiffs    are
          conjectural and otherwise
          insufficient. ................................................25

C.    Plaintiffs' Allegations of Injury Based on
      the Mere Existence of Certain NYPD
      Records Does not Confer Standing............................28

D.    Plaintiffs' Subjective Fears Are Not
      Transformed       Into      Sufficient
      Injury-in-Fact Merely Because They
      Allegedly Arise From Equal Protection
      and Other Constitutional Violations. ...........................32

POINT II

THE DISTRICT COURT PROPERLY
FOUND THAT PLAINTIFFS' INJURIES
WERE NOT FAIRLY TRACEABLE TO
THE NYPD .........................................................................37

iii

**Page**

POINT III

      THE DISTRICT COURT ALSO PROPERLY FOUND THAT PLAINTIFFS' ALLEGATIONS OF PURPOSEFUL DISCRIMINATION FAIL TO MAKE OUT A PLAUSIBLE CLAIM ...........................................................43

      A.    The Court Properly Considered The "More Likely Explanation" When Determining the Plausibility Of Plaintiffs' Claims ..........................................................53

      B.    The District Court Did Not Choose Between Two Plausible Explanations..........................54

      C.    Plaintiffs' Argument That The Factual Allegations in the Complaint State a Facially Discriminatory Government Classification And Thus Conclusively Establish Purposeful Discrimination Should Be Rejected.......................................................54

      D.    Iqbal Applies With Equal Force to Bivens and Monell Claims...........................................60

      E.    Policy Arguments Are Not Applicable On A Motion To Dismiss............................................61

CONCLUSION ......................................................................62

iv

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Abdur-Rashid v. New York City Police Department,*
   No. 101559/2013,
   2014 N.Y. Misc. LEXIS 4114 (N.Y. Sup. Ct. September 11, 2014) ................31

*ACLU v. NSA,*
   493 F.3d 644 (6th Cir. 2007) ...................................................................... 17, 24

*Adarand Constructors v. Pena,*
   515 U.S. 200 (1995) ..........................................................................................47

*Allen v. Wright,*
   468 U.S. 737 (1984) ................................................................... 33, 34, 36, 40

*American Dental Ass'n v. Cigna Corp.,*
   605 F.3d 1283 (11th Cir. 2010) ..........................................................................53

*Americans United for Separation of Church & State v. Reagan,*
   786 F.2d 194 (3d Cir. 1986),
   *cert. denied*, 479 U.S. 914 (1986) ....................................................................34

*Anderson v. Davila,*
   125 F.3d 148 (3d Cir. 1997) ..............................................................................19

*Antonelli v. New Jersey,*
   419 F.3d 267 (3d Cir. 2005) ..............................................................................46

*Argueta v. U.S. Immigration & Customs Enforcement,*
   643 F.3d 60 (3d Cir. 2011) ................................................................................55

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .......... 1, 9, 12, 45, 46, 47, 48, 52, 53, 54, 55, 56, 57, 59, 60

*Awad  v. Ziriax,*
   670 F.3d 1111 (10th Cir. 2012) .........................................................................36

**Cases** <span style="float:right">**Pages**</span>

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................. 1, 12, 47, 48, 53, 60

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................... 40, 41

*Bradley v. United States*,
    299 F.3d 197 (3d Cir. 2002) ........................................................................ 58

*Brunwasser v. Johns*,
    95 Fed. Appx. 409 (3d Cir. 2004) ............................................................... 23

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ........................................................................................ 47

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) .................................................................................... 58

*Church of Scientology Flag Serv. v. City of Clearwater*,
    2 F.3d 1514 (11th Cir. 1993),
    *cert. denied*, 513 U.S. 807 (1994) ............................................................. 36

*Church of Scientology v. Cazares*,
    638 F.2d 1272 (5th Cir. 1981) ..................................................................... 36

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found*,
    538 U.S. 188 (2003) .................................................................................... 46

*Clapper v. Amnesty Int'l*,
    133 S. Ct. 1138 (2013) ................................................................................ 20

*Cmty. Servs. v. Wind Gap Mun. Auth.*,
    421 F.3d 170 ( 3d Cir. 2005) ...................................................................... 46

*Constitution Party of Pa. v. Cortes*,
    433 Fed. Appx. 89 (3d Cir. 2011) ............................................................... 27

**Cases**                                                                                                **Pages**

*County Concrete Corp. v. Twp. of Roxbury,*
    442 F.3d 159 (3d. Cir. 2006)..............................................................57

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) .........................................................................14

*DiBiase v. SmithKline Beecham Corp.,*
    48 F.3d 719 (3d Cir. 1995)................................................................56

*Doe v. Lower Merion Sch. District,*
    665 F.3d 524 (3d Cir. 2011),
    *cert. denied*, 132 S. Ct. 2773 (2012) ......................................... 58, 59

*Doe v. Nat'l Bd. of Med. Examiners,*
    210 Fed. Appx. 157 (3d Cir. 2006) ...................................................23

*Doe v. Sizewise Rentals, LLC,*
    530 Fed. Appx. 171 ( 3d Cir. 2013) ..................................................52

*Donohoe v. Duling,*
    465 F.2d 196 (4th Cir. 1972)............................................................44

*Duquesne Light Co. v. United States EPA,*
    166 F.3d 609 (3d Cir. 1999).......................................................37, 39

*Eaford v. MR. P. LAGANA,*
    10-4087 (SRC), 2011 U.S. Dist. LEXIS 59822 (D.N.J. June 6, 2011)..............28

*Fifth Ave. Peace Parade Committee. v. Gray,*
    480 F.2d 326 (2d Cir. 1973)..............................................................19

*Flint v. Langer Transp. Corp.,*
    762 F.Supp.2d 735 (D.N.J. 2011),
    *aff'd*, 480 Fed. Appx. 149 (3d Cir. 2012)........................................42

*Garcia v. City of Paterson*, No. 11-cv-6587 (CCC-JAD) 2012 U.S. Dist.
    LEXIS 132515 (D.N.J. Sept. 17, 2012)............................................60

**Cases**                                                                                                          **Pages**

*George v. Rehiel,*
    738 F.3d 562 (3d Cir. 2013) ................................................................52

*Glassman v. Computervision Corp.,*
    | 90 F.3d 617 (1st Cir. 1996) ..............................................................55

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.,*
    739 F.2d 466 (9th Cir. 1984) .............................................................26

*Gordon v. Warren Consol. Bd. of Ed.,*
    706 F.2d 778 (6th Cir. 1983) .............................................................18

*Grassroots Recycling Network, Inc. v. E.P.A.,*
    429 F.3d 1109 (D.C. Cir. 2005) .........................................................25

*Gratz v. Bollinger,*
    539 U.S. 244 (2003) ..........................................................................34

*Handschu v. Special Services,*
    71 Civ. 2203 (CSH) (S.D.N.Y.) ........................................................10

*Handschu v. Special Servs. Div.,*
    349 F.Supp.766, 769 (S.D.N.Y. 1972) ..............................................44

*Hartz Mt. Indus., Inc. v. Polo,*
    2005 U.S. Dist. LEXIS 25411 (D.N.J. October 26, 2005) .................39

*Heckler v. Matthews,*
    465 U.S. 728 (1984) ..........................................................................35

*Hunt v. Bullard,*
    95-0744-P-S, 1997 U.S. Dist. LEXIS 21657 (S.D. AL 1997) ...........24

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997) ............................................................55

**Cases**                                                                    **Pages**

*In Re The City of New York,*
    607 F.3d 923 (2d Cir. 2010) ....................................................... 30, 59

*Laird v. Tatum,*
    408 U.S. 1 (1972) ........................ 8, 10, 11, 14, 15, 16, 17, 18, 20, 23, 24, 43, 61

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ...................................................................58

*Linda R. S. v. Richard D.,*
    410 U.S. 614 (1973) ...................................................................33

*Lujan v. Defenders of Wildlife,*
    504 U.S. 332 (2006) ........................................ 7, 8, 13, 14, 20, 23, 28, 32, 37, 40

*Lundy v. Hochberg,*
    91 Fed. Appx. 739 (3d Cir. 2003) ....................................................39

*Marin v. Landgraf,*
    No. 11-690 (MAS) (LHG),
    2013 U.S. Dist. LEXIS 11900 (D.N.J. January 29, 2013) ................................26

*McKenna v. City of Philadelphia,*
    649 F.3d 171 (3d Cir. 2011) ..........................................................42

*McTernan v. City of York,*
    564 F.3d 636 (3rd Cir. 2009)..........................................................60

*Meese v. Keene,*
    481 U.S. 465 (1987) ...................................................................36

*N.A.I.F. Inc. v. Snyder,*
    No. 03-506 JJF, 2005 U.S. Dist. LEXIS 5103 (D. Del. Mar. 30, 2005)............33

*Nordlinger v. Hahn,*
    505 U.S. 1 (1992) .....................................................................57

ix

**Cases**                                                                                      **Pages**

*Northeastern Fla. Chapter of Associated Gen. Contractors of America v.*
  *City of Jacksonville,*
    508 U.S. 656 (1993) ........................................................................................35

*Nour v. New York City Police Dep't,*
  92 Civ. 7066 (JFK), 1995 U.S. Dist. LEXIS 1096 (S.D.N.Y. 1995)................19

*Paton v. Laprade,*
  524 F.2d 862 (3d Cir. 1975)...........................................................................28

*Pers. Adm'r of Mass v. Feeney,*
  442 U.S. 256 (1979) ................................................................ 46, 57

*Philadelphia Yearly Meeting of Religious Soc. of Friends v. Tate,*
  519 F.2d 1335 (3d Cir. 1975)............................................. 18, 30, 31, 32, 40, 44

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985) ......................................................................................14

*Pitt News v. Fisher,*
  215 F.3d 354 (3d Cir. 1999)............................................................................41

*Presbyterian Church (U.S.A.) v. United States,*
  870 F.2d 518 (9th Cir. 1989)...........................................................................18

*Raza et. al. v. City of New York,*
  13 Civ. 3448 (PKC) (JMA) (E.D.N.Y.) ..........................................................10

*Rees v. Office of Children and Youth,*
  473 Fed. Appx. 139 (3d Cir. 2012) .................................................................60

*Reilly v. Ceridian Corp.,*
  664 F.3d 38 (3d Cir. 2011)..............................................................................23

*Riggs v. City of Albuquerque,*
  916 F.2d 582 (10th Cir. 1990).........................................................................18

x

**Cases**                                                                                          **Pages**

*Rotenberg v. Lake Charter Bus Corp.,*
  2014 U.S. Dist. LEXIS 9082 (D.N.J. January 24, 2014) ...................................42

*Sandy Hook Watermans Alliance, Inc. v. N.J. Sports & Exposition Auth.,*
  2011 U.S. Dist. LEXIS 79488 (D.N.J. July 20, 2011).......................................38

*Shakman v. Dunne,*
  829 F.2d 1387 (7th Cir. 1987)........................................................................39

*Shaw v. Reno,*
  509 U.S. 630 (1993) ........................................................................................34

*Simon v. E.Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) ..........................................................................................37

*Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.,*
  727 F.3d 502 (6th Cir. 2013).............................................................................52

*Startzell v. City of Philadelphia,*
  533 F.3d 183 (3d Cir. 2008).............................................................................57

*Storino v. Borough of Point Pleasant Beach,*
  322 F.3d 293 (3d Cir. 2003).............................................................................25

*United States v. AVX Corp.,*
  962 F.2d 108 (1st Cir. 1992).............................................................................28

*United States v. Hays,*
  515 U.S. 737 (1995) ................................................................................ 33, 34

*Valley Forge Christian College v. Americans United for Separation of
  Church & State,*
  454 U.S. 464 (U.S. 1982) ................................................................................33

*Vernon v. City of Los Angeles,*
  27 F.3d 1385 (9th Cir. 1994)............................................................................24

**Cases**                                                                      **Pages**

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ............................................................................46

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................................29

*Washington v. Davis,*
    426 U.S. 229 (1976) ............................................................................57

*Weinberger v. Wiesenfeld,*
    420 U.S. 636 (1975) ............................................................................47

**Statutes**

Fed. R. Civ. P. 12(b)(1)........................................................................ 7, 10, 13, 38

Fed. R. Civ. P. 12(b)(6)........................................................................ 7, 9, 10, 57

**Other Authorities**

*Domestic Investigations and Operations Guide* § 4.3(B)(2)(a) (2008)...................51

*Domestic Investigations and Operations Guide* § 4.3.3.2.1 (2011) .......................51

## STATEMENT OF THE ISSUES

1.   Whether the District Court properly dismissed the amended complaint because plaintiffs' assertions of injury based upon surveillance of the Muslim community are not concrete and particularized enough to establish Article III standing.

2.   Whether the District Court properly dismissed the amended complaint because plaintiffs' alleged injuries are not fairly traceable to the City of New York but rather to the Associated Press's unauthorized release of documents, without redacting identifying information, in a series of articles providing the AP's own interpretation of the documents.

3.   Whether the District Court properly dismissed the amended complaint because plaintiffs' allegation—that the City of New York conducted surveillance of the Muslim community based solely upon religious status as Muslim—fails to allege a plausible claim under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

## STATEMENT OF THE RELEVANT FACTS

Plaintiffs allege that following the terrorist attacks of September 11, 2001 the New York City Police Department ("NYPD") began a secret spying program, defined in the amended complaint as the "Program," in early 2002 to infiltrate and

monitor Muslim life in and around New York City including New Jersey.   J.A.-24, 37, ¶¶ 2, 3, 36.[1]   Plaintiffs allege, in conclusory fashion, that the NYPD illegally and unconstitutionally targeted New Jersey Muslims for surveillance based solely upon their religion.   J.A.-24, ¶ 1.[2]   Plaintiffs do not cite a written statement or other pronouncement embodying the discriminatory policy they allege exists.   Rather, the amended complaint is replete with the conclusory assertion that the "Program reflects" an unconstitutional and discriminatory policy by the City of New York to target the Muslim community for surveillance solely on the basis of religion.   J.A.-37, 45, 67, ¶¶ 36, 57, 67.   Notably, plaintiffs do not allege that the acts of surveillance alone, in the absence of their self-assigned discriminatory purpose, are illegal or unconstitutional.

### A.   Allegations About "Surveillance" of Muslims Generally

Plaintiffs allege that the surveillance in New Jersey was directed at mosques, restaurants, retail stores, schools, associations and the individuals who own, operate or visit those establishments.   J.A.-24, 37, ¶¶ 3, 36.   Plaintiffs allege that the

---

[1] References to "J.A.-__" are to the page in the Joint Appendix filed July 3, 2014. References to "¶¶__" are to the numbered paragraphs of the document being cited contained in the Joint Appendix.

[2] The City need not, and does not, accept plaintiffs' conclusory allegations, including that of purposeful discrimination, as true, nor does the City endorse or engage in discrimination.

NYPD collected information through various means including photographs and videos, undercover officers and informants, and that the NYPD created certain reports containing the information collected.  J.A.-24-25, ¶¶ 4, 5.  As part of the so-called Program, for example, the NYPD created over twenty precinct-level maps of the City of Newark noting locations of mosques and businesses, J.A.-38, 44, ¶¶ 38, 53, and prepared reports about discussions in mosques after the controversial publication of a Danish artist's cartoons of the Prophet Muhammad in February 2006 and after the crash of a plane into a building in Manhattan in October 2006. J.A.-42, ¶ 47(c).

The Amended Complaint further alleges that the NYPD designated twenty-eight countries as "ancestries of interest."  J.A.-39, ¶ 41.  Plaintiffs allege that the NYPD chose to surveil establishments with "ancestries of interest" only if they are Muslim and not, for example, Egyptians if they are Coptic Christians, Syrians if they are Jewish, or Albanians if they are Catholic or Orthodox Christian. J.A.-39, ¶ 42.

     B.     **Plaintiffs Do Not Allege Facts That Constitute "Surveillance"**

While plaintiffs make allegations of a "Program" of "surveillance" directed at the Muslim community generally, the allegations of "surveillance" against them

individually are conclusory and do not amount to "surveillance," defined by Merriam-Webster as a "close watch kept over someone or something."

For example, at most it is alleged that a photograph and description of the store of two plaintiffs (All Body Shop and United Beef) appear in the Newark report and the same for two mosques represented by plaintiff Council of Imams. J.A.-28, 30-31, ¶¶ 14, 19, 20.   Plaintiffs Mohammed, Doe, and Tahir allege only that they were affiliated with a Muslim Student Association that was listed in a report. J.A-32-34, ¶¶ 24, 27, 29.   Similarly, plaintiff Hassan alleges only that the mosques he attends were identified in an NYPD report. J.A.-27, ¶12.   Plaintiff Abdur-Rahim claims only that a photo and address of two schools where she has worked are listed in a report. J.A.-35-36, ¶¶ 31, 32.   Plaintiff Abdullah, who is married to plaintiff Abdur-Rahim, similarly relies on the same photo of the school where his wife worked because he is alleged to have been on its Board of Directors.[3] J.A.-36-37, ¶ 34.   None of the six individual plaintiffs (Hassan, Mohammed, Doe, Tahir, Abdur-Rahim, and Abdullah) allege that they were personally surveilled or that any personal information including their names was collected or put into a report.

---

[3] The photo of the school is also alleged to be a photo of the residence of Abdur Rahim and Abdullah but there is no allegation that any alleged NYPD report reflects that fact.   J.A.-36, ¶¶ 32, 34.   Rather, it is plaintiffs who have made that fact known because they have alleged it in this lawsuit.

Plaintiff Muslim Students Association of the U.S. and Canada. Inc. ("MSA National") alleges that two of its member organizations, the Muslims Student Associations for the Rutgers University campuses at Newark and New Brunswick, were subject to surveillance.  J.A.-29, ¶¶ 16-17.  In support of this allegation, plaintiffs cite to an NYPD report that lists the names of professors, scholars, and students. J.A- 44, ¶51.

Plaintiff Muslim Foundation Inc. ("MFI") alleges that it owns and operates the Masjid-e-Ali mosque and alleges that the mosque was surveilled and identified in an NYPD report as the subject of surveillance.  J.A.-31, ¶22.  Plaintiffs allege that the NYPD created an analytical report on plaintiff MFI (and the two mosques who are members of plaintiff CINJ).   J.A.- 42, ¶47(b).

C.    **Plaintiffs' Alleged Injuries**

According to the amended complaint, as a result of the Associated Press' disclosure of the "Program" and the NYPD's internal documents, various plaintiffs have allegedly been stigmatized and "fear" future injury, have placed self-imposed restrictions on their religious practice, and have experienced a loss of customers (but not revenue) and an alleged decline in attendance and contributions at two mosques. J.A.-27-37, ¶¶ 11-34.  Plaintiffs also allege that they were further stigmatized by statements made by the Mayor and Police Commissioner of New York, in response

5

to the AP's articles, to the effect that the City's actions are taken for public safety. J.A.-48, ¶64-65.

### D. Alleged "Injuries" Occur Only After the Associated Press Releases Unredacted Documents

Plaintiffs explicitly aver that their alleged injuries "followed the disclosure" of various documents such as the "Newark" report which "has been widely publicized." *See, e.g.,* J.A.-25, 28-29, 30-31, 35, 40-41, ¶¶ 5, 15, 20, 21, 31, 45. Although the amended complaint is silent on who released the information, it is the Associated Press that covertly obtained those confidential NYPD documents and published them without redactions in a series of articles, adding their own interpretation of the documents. J.A.-214-15 (Farrell Dec. ¶ 3). Plaintiffs do not (and cannot) allege that the NYPD ever made the documents, or the information they contain, public.

### E. No Violation of New Jersey Criminal or Civil Law

After the release by the Associated Press of the confidential NYPD documents, the New Jersey Attorney General conducted an investigation into the NYPD's activities, as reported by the Associated Press, that form the basis of plaintiffs' complaint. On May 24, 2012, after a three-month investigation, the New Jersey Attorney General concluded that "the fact finding review, which is ongoing,

6

has revealed no evidence to date that the NYPD's activities in the state violated New Jersey civil or criminal laws."   J.A.-219-220 (Farrell Decl. Ex. B, 1).

F.    **Procedural History**

Plaintiffs filed a complaint on June 6, 2012, naming the City of New York ("City") as the sole defendant. J.A.-4 (Dkt. 1).   That complaint was never served on the City.   Four months later, on October 3, 2012, plaintiffs filed a First Amended Complaint, which was served on the City on October 4, 2012.   J.A.-5 (Dkt. 10); J.A.-23-52.   In lieu of answering, the City moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of standing and 12(b)(6) for failure to state a plausible claim.   J.A.-6 (Dkt. 15).

G.    **The Decision Below**

In an opinion dated February 20, 2014, the District Court (U.S.D.J. William J. Martini) reviewed the amended complaint in detail and granted the City of New York's motion to dismiss, finding both that the plaintiffs lacked standing and failed to state a plausible claim.   J.A.-13-22.

In addressing the 12(b)(1) motion for lack of standing, the District Court set out the three prong test in *Lujan v. Defenders of Wildlife*, 504 U.S. 332, 341 (2006) and concluded that the amended complaint failed to satisfy two of the three elements

needed to establish the "constitutional minimum of standing," namely, the "injury in fact" prong and the "causal connection" prong of the *Lujan* test.

The Court held that the plaintiffs had not alleged an injury in fact because the Supreme Court in *Laird v. Tatum*, 408 U.S. 1 (1972) had considered allegations similar to those raised in the amended complaint and rejected them as a basis for Article III standing.

The Court also found that even if plaintiffs had alleged an injury in fact, plaintiffs did not demonstrate the required causation element of standing. The Court held that the unauthorized release of unredacted confidential NYPD documents by the Associated Press, and the AP's corresponding articles expressing its interpretation of those documents, were the cause of plaintiffs' alleged injuries. The Court found that the amended complaint did not allege any injuries prior to the AP's unauthorized release of the confidential documents; plaintiffs' injuries all arose after the unauthorized disclosure by the Associated Press. The Court concluded that the injuries alleged were not "fairly traceable" to any act of surveillance by the NYPD but rather to the release of information by the Associated Press.

The Court next found that, even assuming plaintiffs had standing to sue, the amended complaint should be dismissed pursuant to Federal Rule of Civil Procedure

8

12(b)(6) because plaintiffs did not plead facts sufficient to plausibly infer a discriminatory purpose and state a claim under the First and Fourteenth Amendments.  The Court stated that where the claim is invidious discrimination based upon religion, plaintiffs must plausibly plead that the City acted with discriminatory purpose.

The District Court found the Supreme Court's decision in *Ashcroft v. Iqbal* particularly instructive because both *Iqbal* and this case grow out of the tensions between security and the treatment of Muslims that is particular to the post-September 11 time period.  Applying the Supreme Court's analysis in *Iqbal*, the Court held that the plaintiffs in this case have not alleged facts from which it can be plausibly inferred that they were targeted solely because of their religion.  The more likely explanation for the surveillance, the Court found, is that the surveillance was for a legitimate law enforcement purpose, i.e., counter-terrorism, and the most obvious reason for that explanation is because the alleged "Program" began just after the attacks of September 11, 2001.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Defendant City Of New York is not aware of any other case or proceeding that is in any way related, completed, pending or about to be presented before this Court. There are two cases pending in federal court in New York that contain factual claims

similar to those presented here -- that the NYPD is conducting surveillance and investigations of Muslims based solely or primarily upon religion. *Raza et. al. v. City of New York*, 13 Civ. 3448 (PKC) (JMA) (E.D.N.Y.) and *Handschu v. Special Services*, 71 Civ. 2203 (CSH) (S.D.N.Y.). The legal claim in *Raza* is a violation of the First and Fourteenth Amendments. The legal claim in *Handschu* is a violation of a consent decree entered in 1985 and modified in 2003 which governs the NYPD's investigations of political activity. Both *Raza* and *Handschu* are currently stayed pending settlement discussions.

## SUMMARY OF ARGUMENT

The District Court properly granted the City of New York's motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) because the plaintiffs lack standing and the amended complaint fails to state a plausible claim.

First, the District Court correctly found that plaintiffs lacked standing for failure to sufficiently allege that they suffered any concrete and particularized injury in fact. As the court recognized, the allegations here are similar to those the Supreme Court considered and rejected in *Laird v. Tatum*, 408 U.S. 1 (1972). Plaintiffs do not allege that defendant's "surveillance" activities in public spaces unlawfully invaded their privacy under the Fourth Amendment or any other law, and

they do not allege that defendants ever stopped, arrested, detained, or prosecuted them. Indeed, after a three-month investigation, the New Jersey Attorney General concluded that defendants' activities violated no criminal or civil law.

Rather, plaintiffs' overarching claim of injury consists of subjective fears based upon defendants' alleged program of surveillance. The court properly found that these types of subjective injuries are not concrete and particularized, as required to establish standing.   A review of plaintiffs' allegations fails to support even their conclusory claim that they were subject to the sort of scrutiny suggested by their repeated use of the word "surveillance."   But even accepting their characterization of the activities described as "surveillance," plaintiffs still have not alleged concrete and imminent injuries necessary to establish standing.   No plaintiff alleges a loss of employment and only one vaguely claims a pecuniary loss.   Plaintiffs cannot transform their own subjective fears into cognizable injuries simply by alleging that those fears led them to change their behaviors.   Nor can certain plaintiffs' generalized suggestions that they lost customers or congregants, without alleging any specifics, salvage those plaintiffs' claims. Finally, contrary to plaintiffs' argument, neither an equal protection claim nor an allegation of stigmatization cloaks them with *per se* standing.

11

Second, the District Court properly held that plaintiffs lack standing on the additional and independent ground that their alleged injuries, even if they were sufficiently concrete and particularized, are not fairly traceable to any act of surveillance by the NYPD.  All of the harms alleged by plaintiffs occurred, if they occurred, only *after* the Associated Press made public certain confidential NYPD documents and did so in unredacted form.  Nowhere in the amended complaint do plaintiffs allege that the NYPD ever publicly released any information collected from the alleged surveillance program or that plaintiffs ever suffered any harm prior to the unauthorized public release of the documents by the AP.

Third, and alternatively, the District Court correctly held that the amended complaint fails because its allegation cannot pass the "plausibility" test set out in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  As the District Court recognized, *Iqbal* is particularly instructive because both *Iqbal* and this case grow out of the same context: the tensions between security and the treatment of Muslims in the post-September 11 era.  Just as in *Iqbal*, the amended complaint here fails to satisfy the plausibility test because the inference that plaintiffs seek – that the surveillance conducted by the NYPD was solely based upon religion – cannot be plausibly inferred from plaintiffs' own allegations.  Contrary to plaintiffs' argument on appeal, the District Court did not

12

choose between two plausible explanations.   Rather, it found plaintiffs' assumption of discriminatory purpose not plausible in the face of the more likely explanation that the surveillance was connected to the NYPD's counter-terrorism effort by, for example, knowing where a foreign or domestic Islamist radicalized to violence might try and conceal himself or attempt to recruit others to assist him.

## ARGUMENT

### POINT I

### THE DISTRICT COURT PROPERLY FOUND THAT PLAINTIFFS LACK STANDING BECAUSE THEY HAVE NOT ALLEGED ANY CONCRETE AND PARTICULARIZED INJURY

The District Court properly dismissed the amended complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction because plaintiffs lack standing. The District Court correctly set out the three prong test to determine standing set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).   J.A.-16-17.

The court, citing to *Lujan*, set forth the test for standing as follows:

First, the plaintiff must have suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.''   Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'   Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

13

J.A.-16-17 (alterations in original).   The District Court also correctly recognized that the plaintiffs bear the burden of demonstrating standing "'with the manner and degree of evidence required at the successive stages of the litigation.'"   J.A.-16 (citations omitted).

Applying these standards, the District Court found that the amended complaint failed to satisfy two of the three elements needed to establish the "constitutional minimum of standing," the "injury in fact" prong and the "causal connection" prong of the *Lujan* test.[4]   We first turn to plaintiffs' failure to allege an "injury in fact."   We address plaintiffs' failure to satisfy the causal connection in Point II, *infra*.

### A. The Controlling Decision in *Laird v. Tatum* Demonstrates that Plaintiffs Have Not Sufficiently Alleged Injury-in-Fact.

#### 1. *Laird* rejected highly similar surveillance-related allegations as insufficient to confer standing.

---

[4] A plaintiff must also satisfy certain "prudential" standing requirements. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985).   Prudential standing requires, *inter alia*, that a party "assert his own legal interests rather than those of third parties," that a claim not be a "generalized grievance" shared by all or a large class of citizens, and that a plaintiff must "demonstrate standing for each claim he seeks to press."   *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citations omitted).   To the extent plaintiffs seek to rely upon the allegations of surveillance of Muslims generally (rather than those regarding plaintiffs specifically), plaintiffs do not satisfy the prudential standing requirement.

The District Court correctly found that the allegations in the amended complaint are similar to the surveillance-related allegations considered by the Supreme Court in *Laird v. Tatum*, 408 U.S. 1 (1972), and rejected by that Court as insufficient to confer standing on the plaintiffs there.   J.A.-17.   In *Laird*, plaintiffs sought injunctive relief against the Army's surveillance of civilian political activity. The Army's information gathering system in *Laird* involved the attendance by Army intelligence agents at meetings that were open to the public, the preparation of field reports describing the meetings (containing the name of the sponsoring organization, the identity of the speakers, the number of persons present, and an indication of whether any disorder occurred), and the collecting of information from the news media.   *Id.* at 6.   This information was reported to Army Intelligence headquarters, disseminated from headquarters to major Army posts around the country, and stored in a computer data bank.   *Id.*   The Army's surveillance program was described as "massive and comprehensive."   *Id*. at 26.

The Supreme Court identified the issue before it as "whether the jurisdiction of a federal court may be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader

15

in scope than is reasonably necessary for the accomplishment of a valid governmental purpose." *Laird,* at 10.

The Supreme Court found that the plaintiffs in *Laird* lacked standing because "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id*. at 13-14. The plaintiffs were not able to demonstrate that they were chilled by "any specific action of the Army against them." *Id*. at 3.

Similar to *Laird*, plaintiffs here allege that the NYPD engaged in a secret "Program" of surveillance and information gathering. J.A.-24, ¶ 2. Just as in *Laird*, plaintiffs here allege surveillance at public places. J.A.-24, ¶ 3. ("at least twenty mosques, fourteen restaurants, eleven retail stores, two grade schools and two Muslim Student Associations" in New Jersey). Also similar to *Laird*, plaintiffs allege that information from the surveillance is reflected in reports. J.A.-24, ¶ 3. ("The thoroughness and precision of the Department's surveillance is reflected in its creation of more than twenty precinct-level maps of the City of Newark, noting the location of mosques and Muslim businesses and the ethnic composition of the Muslim community."). Also as in *Laird*, plaintiffs allege that the exercise of their First Amendment rights is being chilled because of the existence of the "Program." J.A.-27-33, 35, ¶¶ 13, 17, 23, 25, 27, 30. Accordingly, the District Court properly

16

found that the allegations in *Laird* and in the instant case are similar and that, just as

in *Laird*, plaintiffs here have not alleged an "injury in fact."

## 2.    Plaintiffs fail to successfully distinguish *Laird*.

Plaintiffs offer no persuasive rebuttal to *Laird*.   They first argue that *Laird* is

not the proper comparison because, they claim, *Laird* did not involve surveillance of

the plaintiffs themselves but only the "*possibility* that a government surveillance

program might ensnare them."    Appellants' Br. 21. (emphasis in original).

Plaintiffs' assertion is simply false.   The plaintiffs in *Laird* asserted that they were

the subject of the Army's surveillance program.  *See, e.g.*, *Laird*, 408 U.S. at 24

(Douglas, J., dissenting) ("The claim that respondents [plaintiffs] have no standing

to challenge the Army's ***surveillance of them*** and the other members of the class

they seek to represent . . . .") (emphasis added); *id*. at 26 ("Respondents were targets

of the Army's surveillance."); *id*. at 39 (Brennan,  J., dissenting) ("The record

shows that most if not all of the [respondents] and/or the organizations of which they

are members have been the subject of Army surveillance reports and their names

have appeared in the Army's records.").   Accordingly, plaintiffs' attempt to

distinguish *Laird* fails.  *See ACLU v. NSA*, 493 F.3d 644, 660 (6th Cir. 2007) ("The

Court [in *Laird*] held that its plaintiffs, *subjects of secret United States Army*

*surveillance*, may have suffered a 'subjective chill,' but did not allege a sufficiently

17

concrete, actual, and imminent injury to entitle them to standing.") (emphasis added).[5]

Because the plaintiffs in *Laird* alleged that they were subject to surveillance, the Supreme Court's wording in *Laird* which plaintiffs here rely upon—that the Army had not taken "*any specific action* . . . against them*"*—refers to something more than the act of surveillance. *Id*. at 3 (emphasis added). In context, the Supreme Court's holding means that to establish standing, plaintiffs have to plead that they were both surveilled and that the defendant took some further action that was intended to harm plaintiffs such as publicizing the information collected, forwarding the collected information to a current or prospective employer, or some other specific concrete action taken to harm plaintiff. *See, e.g.*, *Gordon v. Warren Consol. Bd. of Ed.*, 706 F.2d 778, 781 (6th Cir. 1983) ("The mere presence of [police surveillance] . . . in the classroom does not create a justiciable controversy."); *Philadelphia Yearly Meeting of Religious Soc. of Friends v. Tate*, 519 F.2d 1335, 1336-38 (3d Cir. 1975) (police photographing, data gathering, and maintaining files

---

[5] Two cases that plaintiffs rely on *Riggs v. City of Albuquerque*, 916 F.2d 582 (10th Cir. 1990) and *Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518(9th Cir. 1989) should be disregarded as both improperly distinguish *Laird* by relying on the same flawed characterization of the operative facts that plaintiffs set forth in their brief. In any event, neither decision is controlling here.

regarding attendees at public assemblies and demonstrations is legal); *Fifth Ave. Peace Parade Committee v. Gray*, 480 F.2d 326, 333 (2d Cir. 1973) (anti-war demonstrators lacked standing in absence of a showing of specific misuse of any information the FBI might have obtained about them); *cf. Nour v. New York City Police Dep't*, 92 Civ. 7066 (JFK), 1995 U.S. Dist. LEXIS 1096, at *8-10 (S.D.N.Y. 1995) ( "nerve raking [sic]" and "shocking" surveillance that impeded the "forward progress of [plaintiff's] movements," such that he no longer had a "private life," insufficient to establish any cognizable constitutional violation) (emphasis added).[6]

Here, none of the individual plaintiffs allege that they were personally surveilled or that any of their personal information appears in an NYPD record. But, even assuming *arguendo* that plaintiffs' adequately allege that they themselves were "surveilled" as that word is commonly understood (which they do not), that would not be enough to establish the "injury in fact" prong of standing.

Finally, plaintiffs' reliance on cases involving the collection of telephone records by the NSA is misplaced.   Appellants' Br. 22.   None of the cases cited by

---

[6] *Anderson v. Davila*, 125 F.3d 148 (3d Cir. 1997) does not stand for the proposition that surveillance is enough by itself to establish standing.  *Anderson* specifically states, "We begin by conceding that the Government's surveillance of individuals in public places does not, by itself, implicate the Constitution."  *Id.* at 160.

plaintiffs stands for the proposition that police surveillance in a public place, without more, establishes standing.   Rather, those cases, unlike the allegations here, involve monitoring plaintiffs' phone records which implicates Fourth Amendment privacy issues.  *See*, *e.g.*, *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1145-46 (2013) (plaintiffs claimed their telephone and email communications were likely to be intercepted pursuant to a section of the Foreign Intelligence Surveillance Act).

**B.     Plaintiffs' Various Allegations of Injury All Fail Because the Alleged Harms Are Not Concrete, Particularized, or Imminent.**

A review of plaintiffs' individual alleged injuries confirms that they are not concrete, particularized or imminent as required under *Laird* and *Lujan*.

1. **Plaintiffs' alleged injuries based on their own subjective fears are insufficient to confer standing**.

First, plaintiffs' alleged injuries are purely speculative and consist of their fears of what might result from being "surveilled" or their own self-imposed limitations based on those fears.   A look at the allegations of various plaintiffs demonstrates this point:

- Plaintiff Hassan alleges that he has a "fear" that his security clearance "would be jeopardized by being closely affiliated with mosques under surveillance" and so he has chosen to decrease his mosque attendance.

He is also "concerned" that his superiors "will" have diminished trust in him, thereby harming his career "prospects."   J.A.-28, ¶ 13.

- Plaintiff Unity Beef Sausage Company ("Unity") alleges that the store owner now "fears conducting his legitimate business" and that "he is concerned that anyone who comes in or looks at him from across the street might be an NYPD spy."   J.A.-31, ¶ 21.

- Plaintiff Muslim Foundation Inc. ("MFI") claims that the surveillance "casts an unwarranted cloud of suspicion upon the mosque and its membership."   MFI also alleges that it has changed its religious services and programming as a direct result of the NYPD surveillance so as not "to be perceived as controversial" and that MFI's leaders "feared" that by inviting religious authorities who might nevertheless be "perceived as controversial," their views "would be" attributed to the mosque's membership.   J.A.-32, ¶ 23.

- Plaintiff Mohammed, a member of the Muslim Students Association at Rutgers University, alleges that he now avoids discussing his faith or his MSA participation and praying in places where non-Muslims "might see him doing so."   J.A.-33, ¶ 25.

- Plaintiff Jane Doe alleges that she no longer discusses religious topics at MSA meetings because she has a "fear" that such discussions "would be" misunderstood and taken out of context by those suspicious of her religion.   J.A.-33-34, ¶ 27.

- Plaintiff MSA National alleges that "surveillance" of two of its member MSAs "invites additional discrimination and prejudice and diminishes the member MSAs' ability to fulfill their spiritual and practical missions."   J.A.-29, ¶17.

- Plaintiff Soofia Tahir alleges the surveillance will "likely endanger her future educational and employment opportunities" and "adversely affect her future job prospects and any other further educational pursuits."   She has also changed the way she prays because of a "fear" of being overheard.   J.A.-34, ¶ 29.

- Plaintiff Zaimah Abdur-Rahim "fears that her future employment prospects are diminished by working at two schools under surveillance by law enforcement."   She also alleges that "the fact that a photograph of her home appears on the internet in connection with the NYPD's surveillance" has "decreased the value of the home and diminished the prospects for sale of the home."   J.A.-36, ¶ 32.

22

- Plaintiff Abdul-Hakim Abdullah, Zaimah Abdur-Rahim's husband, alleges that there has been a decrease in the value of his home because of the surveillance.   J.A.-36-37, ¶ 34.

None of plaintiffs' alleged "fears" meet the threshold requirement of concrete or particularized injuries sufficient to establish standing.   *See, e.g.*, *Lujan*, 504 U.S. at 562-71; *Laird*, 408 U.S. at 11 (subjective fear of a future action not enough to establish standing); *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41-46 (3d Cir. 2011) (fears of an increased risk of identity theft not actual or imminent); *Doe v. Nat'l Bd. of Med. Examiners*, 210 Fed. Appx. 157, *160-61 (3d Cir. 2006) (fear that plaintiff may at some point be discriminated against because of his test scores was not actual or imminent); *Brunwasser v. Johns*, 95 Fed. Appx. 409, 411 (3d Cir. 2004) (plaintiff's fear about pursuing various legal issues because doing so may result in the imposition of sanctions against him was not an injury in fact).

### 2. Plaintiffs' contentions that they will suffer future harms—as yet unrealized—based on others' reactions to the disclosures about surveillance are purely speculative.

Moreover, to the extent plaintiffs' alleged injuries are based on their perception of how others may perceive or react to them, their claims are also pure speculation. Accordingly, all of plaintiffs' alleged self-imposed limitations including decreasing their mosque attendance, changing their religious services, or changing where they

choose to pray are not sufficient to establish standing.  *See Laird*, 408 U.S. at 11; *ACLU*, 493 F.3d at 661, 659-73 (6th Cir. 2007) ("self-imposed unwillingness to communicate" insufficient to meet First Amendment standing requirement that plaintiff   "establish that he or she is regulated, constrained, or compelled directly by the government's actions"); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1395 (9th Cir. 1994) (subjective chill not "constitutionally cognizable" where plaintiff, the assistant chief of police, alleged that his religious practices were chilled by a police investigation into whether his personal religious beliefs were affecting his job performance); *Hunt v. Bullard*, 95-0744-P-S , 1997 U.S. Dist. LEXIS 21657, at * 4 (S.D. AL 1997) (plaintiff's self-imposed decision not to attend religious services did not amount to an irreparable injury warranting an injunction).

Plaintiffs' injuries are also not actual or imminent.   For example, not a single plaintiff alleges that his or her career or employment was in fact injured as a result of the NYPD's alleged surveillance.   To the contrary, plaintiff Hassan alleges that he "has received numerous honors for his service in military intelligence."   J.A.-27, ¶ 11.   Thus, the alleged "Program," alleged to have begun in 2002, has not had any adverse effects on plaintiff Hassan's career to date.

Similarly, the conjecture about a decrease in the value of the home of plaintiffs Abdul-Hakim Abdullah and Zaimah Abdur-Rahim is not actual or

imminent as there is no allegation that they have or are currently selling their home. *See Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 297-98 (3d Cir. 2003) (plaintiffs' injuries are too speculative where they could not demonstrate that their hotel was subject to anything other than prospective damages); *In re Title Ins. Litig.*, 683 F.3d 451, 460-61 (3d Cir. 2012) (no standing to bring an anti-trust action against title insurance companies for practices that would purportedly increase rates because plaintiffs could only speculate as to when, if ever, they would purchase title insurance); *Grassroots Recycling Network, Inc. v. E.P.A.*, 429 F.3d 1109, 1112 (D.C. Cir. 2005) (no standing where plaintiffs alleged that EPA rules would allow state government to adopt laws regarding landfills that would decrease the value of their home).

### 3. The limited allegations of business-related injury by three plaintiffs are conjectural and otherwise insufficient.

Finally, only three plaintiffs make allegations related to their current business.  They include:

- Plaintiff All Body Shop Inside & Outside ("All Body Shop") alleges that the number of customers visiting the store has decreased and that some customers have told the owners by telephone that they did not feel comfortable visiting the location due to alleged NYPD surveillance.  J.A.-30, ¶ 19.

25

- Plaintiff Unity Beef Sausage Company ("Unity Beef") alleges that "many regular customers have not been coming to the store since the NYPD's Newark report was made public" and that some customers have called to say "they are no longer comfortable visiting the store." J.A.-31, ¶ 21.

- Plaintiff The Council of Imams in New Jersey ("CINJ") is a membership organization comprising a dozen New Jersey mosques. Two of the mosques, Masjid al-Haqq and Masjid Ali K. Muslim, allege that there has been a decline in attendance and contributions as a result of the NYPD's alleged surveillance.   J.A.-28-29, ¶¶ 14-15.

While plaintiffs All Body Shop and Unity Beef allege that they now have fewer customers, neither attempts to quantify the number of customers lost and neither alleges a loss of revenue or income.   Similarly, two mosques in the membership of plaintiff CINJ allege a "decline in attendance" but also do not quantify the decline.   Thus, neither has alleged a concrete economic injury.   *See, e.g.*, *Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) (evidence of loss of goodwill and customers was speculative); *Marin v. Landgraf*, No. 11-690 (MAS)(LHG), 2013 U.S. Dist. LEXIS 11900, at *16

(D.N.J. January 29, 2013) (alleged loss of unknown hypothetical customers not concrete enough to sustain a claim for tortious interference).

While CINJ makes an additional allegation that there has not only been a decline in attendance, but also a decline in contributions at the two mosques in its membership, the decline in contributions is not quantified and nowhere is it alleged that there has been an overall decline in revenue or income at those mosques. Moreover, to the extent CINJ's standing relies upon the alleged monetary loss of two of its member mosques, it does not satisfy the third prong of the test for associational standing because to prove a loss of revenue requires the participation of the two individual mosques in the lawsuit  *See United Food & Commer. Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 553 (U.S. 1996).

Finally, as set forth in Point II *infra*, CINJ's assertion that the decline in attendance and contributions "followed the disclosure" of the Program does not satisfy the "causal connection" prong of standing as it is pure speculation and not fairly traceable to the defendant's alleged actions.  *See Constitution Party of Pa. v. Cortes*, 433 Fed. Appx. 89, 93 (3d Cir. 2011) (plaintiffs failed to establish causation as there were no allegations in the complaint, other than conclusory, that the action alleged was responsible for the injury, and that the District Court could not rule out that the injury could have been due to other factors, or the actions of some other third

27

party); *United States v. AVX Corp.*, 962 F.2d 108, 115  1st Cir. 1992) ("'[e]mpirically unverifiable' conclusions, not 'logically compelled, or at least supported, by the stated facts," deserve no deference."); *Eaford v. MR. P. LAGANA*, 10-4087 (SRC), 2011 U.S. Dist. LEXIS 59822, *6 (D.N.J. June 6, 2011) ("[t]he causal connection between Defendants' alleged actions (placing Plaintiff's inmate account on hold) and Plaintiff's litigation difficulties is too attenuated to constitute the causal connection required for standing under *Lujan*.). Accordingly, these allegations are insufficient to satisfy either the first or second prong of the test for standing under *Lujan*.

### C.    Plaintiffs' Allegations of Injury Based on the Mere Existence of Certain NYPD Records Does not Confer Standing.

Moreover, unlike *Paton v. Laprade*, 524 F.2d 862 (3d Cir. 1975), relied upon by plaintiffs, here plaintiffs Hassan, Mohammed, Doe, Tahir, Abdur-Rahim, and Abdullah make no allegations about what the NYPD records are alleged to contain about them as indeed they only make the conclusory allegation that, "upon information and belief, the NYPD also maintains records identifying" them as "targets of surveillance or investigation." J.A.-50, ¶ 72. Aside from this conclusory allegation, the amended complaint does not contain any allegation about what type of information about these plaintiffs is allegedly in the "records." Moreover, despite the disclosure by the Associated Press of documents which

precipitated this lawsuit, these plaintiffs do not allege that their names or any other information about them is contained in the documents released by the AP. Nor does the amended complaint allege that these plaintiffs intend to seek employment from the government or that the existence of these alleged "records" would endanger their future government employment.[7]

Plaintiffs the Council of Imams in New Jersey, All Body Shop Inside & Outside, Unity Beef Sausage Company, and Zaimah Abdur-Rahim allege slightly more—that a photo exists with a description of their business or mosque in an NYPD report. J.A.-28, 30-31, 35, ¶¶ 14, 19, 20, 31.[8] Plaintiff MSA also alleges that their names are in a report on schools that contain the names of professors, scholars, and students. J.A.-44, ¶ 51. Those additional allegations do not save

---

[7] While Plaintiff Hassan alleges that he has a "well-founded fear that his security clearance would be jeopardized," J.A. 27-28, ¶ 13, his fear is not based upon the existence of information collected specifically about him but rather based upon his "being closely affiliated with mosques under surveillance by law enforcement." *Id.* Hassan's alleged grievance (the mosque I attend was surveilled) is the type shared in substantially equal measure by any member of any mosque alleged to have been "surveilled" and thus does not confer standing. *See Warth v Seldin*, 422 U.S. 490, 499 (1975).

[8] Plaintiff Zaimah Abdur-Rahim alleges that there is a photo and a description of a school where she used to teach with a notation that the school is also a private home (which home turns out to be hers, but is not alleged to be described as hers in the police record in question).

these plaintiffs from a failure to adequately plead concrete and particularized injuries because the photo of the exterior of a business, mosque or other building is something that can be found on "Google" or in a phone book.[9]   The mere fact that a police "record" demonstrates that the NYPD is aware of the existence of a business, mosque, or student group—facts which are readily available to the public—cannot be enough to confer standing on someone who is in some way associated with that business, mosque, or student group.   Moreover, just like the earlier plaintiffs discussed, none of these plaintiffs allege that the NYPD "records" about them will endanger their future employment prospects with the government (or otherwise).

Plaintiffs also argue, relying upon *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. Tate*, 519 F.2d 1335 (3d Cir. 1975), that they have standing because of the "widespread availability" of the City's surveillance records.   As a matter of fact, the NYPD does not make surveillance records available.   *See*, *e.g.*, *In Re The City of New York*, 607 F.3d 923, 949-51 (2d Cir. 2010) (after several years of litigation over plaintiffs' requests for sensitive NYPD Intelligence Division

---

[9] While plaintiff Abdur-Rahim does allege that she "reasonably fears that her future employment prospects are diminished by working at two schools under surveillance," that is not an allegation that she was individually under surveillance and is purely speculative.

documents, the Second Circuit granted the City's petition for a writ of mandamus and instructed the District Court to deny plaintiffs' motion to compel the production of the Intelligence Division documents at issue); *Abdur-Rashid v. New York City Police Department*, No. 101559/2013, 2014 N.Y. Misc. LEXIS 4114, at *9-11 (N.Y. Sup. Ct. September 11, 2014) (court upheld denial of FOIL request for records relating to any possible surveillance or investigation of petitioner).

In addition, plaintiffs in *Philadelphia Yearly* alleged no safeguards existed on the disposition or access to the dossiers maintained by the defendants and that such information was available to other law enforcement agencies, private employers, and governmental agencies.  *Id*. at 1337.  Plaintiffs here do not make similar allegations.  Plaintiffs here merely allege that "these records are likely to command attention from law enforcement officials . . . and the public at large to the detriment of the Plaintiffs."  J.A.-50, ¶ 72.  Significantly, the Third Circuit in *Philadelphia Yearly* held that the exchange of information with other law enforcement agencies was not enough by itself to state a claim.  *Id*. at 1338 ("We cannot see where the traditional exchange of information with other law enforcement agencies results in any more objective harm than the original collation of such information.'").  *Philadelphia Yearly* also involved the wilful public disclosure on nationwide television by the Philadelphia Police Department that plaintiffs in that case were the

31

subjects of police dossiers. *Id*. at 1338-39.  Here, there is no allegation that the NYPD disseminated any information about plaintiffs—to the contrary it was the Associated Press who made an unauthorized release of confidential NYPD documents.

Significantly, plaintiffs' claims of potential harm based on the existence of the documents are belied by the fact that the NYPD's "spying program" is alleged to have started in 2002 and, for example, the Newark report was compiled in 2007. J.A.-24, 37, ¶¶ 2, 36; J.A.-207 (Katon Decl. Ex. E) (article identifying the Newark report existing in 2007).   Yet despite those allegations of the "Program" existing for over ten years, and the existence of the Newark report for over five years, plaintiffs do not allege an actual injury caused by the records about which they complain. Finally, as the District Court here recognized, had *Philadelphia Yearly* been decided after *Lujan*, the outcome reached would likely have been different because the court in *Philadelphia Yearly* explicitly said that plaintiffs' injuries were "not concrete." *Id*. at 1339.

### D. Plaintiffs' Subjective Fears Are Not Transformed Into Sufficient Injury-in-Fact Merely Because They Allegedly Arise From Equal Protection and Other Constitutional Violations.

Neither plaintiffs' equal protection claim nor allegations of stigmatization cloak them with *per se* standing, as plaintiffs suggest.   Indeed, the Supreme Court

has repeatedly rejected similar suggestions in the past.  *See United States v. Hays*, 515 U.S. 737, 743 (1995) ("The rule against generalized grievances applies with as much force in the equal protection context as in any other."); *Allen v. Wright*, 468 U.S. 737, 757 (1984) (stigmatic injury not cognizable unless plaintiff can point to some "concrete interest" affected by the purported constitutional violation).

Moreover, the Court in *Valley Forge* made clear that plaintiffs must "identify a[] personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 485 (1982) (emphasis in original).  Such a disagreement, the Court noted, "is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms."  *Id.* at 485-86.  The harm suffered must be concrete, non-speculative, and personal.  *See, e.g.*, *Linda R. S. v. Richard D.*, 410 U.S. 614, 618 (1973) (no standing where plaintiff could only speculate that the perceived harm was caused by the alleged discriminatory policy); *N.A.I.F. Inc. v. Snyder*, No. 03-506 JJF, 2005 U.S. Dist. LEXIS 5103, at *10-11 (D. Del. Mar. 30, 2005) (plaintiff alleging that defendants injured his character by labelling him a security risk lacked standing because he failed to allege a concrete or particularized injury).

33

This requirement applies with equal force where plaintiffs claim to be stigmatized.  *See Allen v. Wright*, 468 U.S. at 757 n.22 (stigmatic injury not cognizable unless plaintiff can point to some "concrete interest" affected by the purported constitutional violation); *Americans United for Separation of Church & State v. Reagan*, 786 F.2d 194, 201 (3d Cir. 1986) (plaintiffs alleging stigmatization as a result of the government's purported violation of the Establishment Clause did not have standing where they could not demonstrate any non-speculative harm as a result of the purported violation), *cert. denied,* 479 U.S. 914 (1986).

Cases cited by plaintiffs in their brief to support their assertion that a discriminatory classification, without more, is an injury in fact for standing purposes are all inapposite.   In each one of the cases cited by plaintiffs, the court either found that the plaintiffs suffered a cognizable harm *as a result of* a purported equal protection violation or dismissed the case for lack of standing.[10]   For example, in

---

[10] *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (plaintiff denied an opportunity to compete for admission on an equal basis had standing); *United States v. Hays*, 515 U.S. 737, 745 (1995) (plaintiffs have standing only when they have alleged they were placed in a racially gerrymandered voting district because the discrimination creates "special representational harms . . . in the voting context."); *Shaw v. Reno*, 509 U.S. 630, (1993) (same); *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984) (plaintiffs not entitled to standing because they could not demonstrate any "concrete interest" impaired by the alleged discriminatory conduct); *Doe v. Lower Merion Sch. Dist*., 665 F.3d 524, 542 (3d Cir. 2011) (plaintiffs have standing where they are

*Northeastern Fla. Chapter of Associated Gen. Contractors of America v City of Jacksonville*, 508 U.S. 656, 666 (1993), the Supreme Court stated that the "injury in fact" element of standing in an equal protection case arises when the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group. *Id*. at 666. In *Northeastern*, the barrier was an affirmative action program. While plaintiffs selectively quoted *Northeastern*, the full quote makes this distinction clear. *Compare* Appellants' Br. 13 ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment." (quoting *Northeastern*, 508 U.S. at 666)); *with Northeastern*, 508 U.S. at 666 ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment *resulting from the imposition of the barrier* . . . . [T]he 'injury in fact' is the inability to compete on an equal footing.") (emphasis added)).

Similarly, all cases relied on by plaintiffs to support their arguments regarding stigmatic harm either involved a concrete harm, overt public condemnation of a religion by the government, or were dismissed for lack of standing. *See*, *Heckler v. Matthews*, 465 U.S. 728, 738 (1984) (plaintiff had standing to contest discriminatory policy where he received fewer Social Security benefits than a comparable woman

---

forced to compete in a raced-based system for school placement), *cert. denied*, 132 S. Ct. 2773 (2012).

would have); *Allen v. Wright*, 468 U.S. at 757 n.22 (stigmatic injury could not confer standing when no "concrete interest" was affected); *Awad v. Ziriax*, 670 F.3d 1111, 1123 (10th Cir. 2012) (plaintiff, who alleged a state constitutional amendment forbidding courts from relying on Sharia Law cast official disfavor on his religion and prevented his will from being probated, had standing); *Church of Scientology Flag Serv. v. City of Clearwater*, 2 F.3d 1514, 1524-25 (11th Cir. 1993) (challenged ordinance subjected plaintiffs to substantial direct regulation and was sufficient to confer standing), *cert. denied*, 513 U.S. 807 (1994); *Church of Scientology v. Cazares*, 638 F.2d 1272, 1279-80 (5th Cir. 1981) (plaintiff had standing to assert Free Exercise claim where defendant mayor's public criticism allegedly rose to the level of false and defamatory and where the plaintiff also sued the mayor for defamation).[11]

---

[11] Finally, plaintiffs argue that they may achieve standing through their allegations of reputational harm.  While reputational injuries may establish Article III standing in certain situations, plaintiffs must still allege an injury that is "distinct and palpable." *Meese v. Keene*, 481 U.S. 465, 473 (1987) (quoting *Allen v. Wright*, 468 US 737, 751 (1984)).  In *Meese*, the plaintiff was able to allege a reputational injury that was sufficiently distinct and palpable because plaintiff was an attorney and member of the California State Senate.  *Id.* at 468.  Moreover, in support of his allegation that he would suffer reputational harm, the plaintiff submitted an analysis of the results of an opinion poll which specifically tested what would happen if he showed films labelled as propaganda.  *Id.* at 474 n.7.  Here, plaintiffs' fears that they will suffer some future reputational injury is highly speculative and not the sort of "distinct and palpable" injury that would confer standing.

Accordingly, for all the foregoing reasons, the District Court properly found

that plaintiffs do not satisfy the "injury in fact" prong to establish standing.

## POINT II

## THE DISTRICT COURT PROPERLY FOUND THAT PLAINTIFFS' INJURIES WERE NOT FAIRLY TRACEABLE TO THE NYPD

The District Court also correctly found that, even if they had asserted an

"injury in fact" sufficient to satisfy the first prong of standing under *Lujan*, which

they have not, plaintiffs would nonetheless lack standing for the independent reason

that they fail to satisfy the "causal connection" prong of the *Lujan* inquiry, as their

injuries are not fairly traceable to the actions of the defendants.   J.A.-18-19.

Standing requirements dictate that a federal court act only to redress injury

that fairly can be traced to the challenged action of the defendant, and not injury that

results from the independent action of some third party not before the court.   *Lujan,*

504 U.S. at 560-61 (1992) (if the injury complained of is "the result [of] the

independent action of some third party not before the court," then a plaintiff will not

have standing to pursue his or her claims) (citation omitted)); *Simon v. E. Ky.*

*Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *Duquesne Light Co. v. United*

*States EPA*, 166 F.3d 609, 613 (3d Cir. 1999) (finding standing requirement not met

where injury is manifestly the product of the independent action of a third party). As demonstrated below, it is clear that plaintiffs' alleged injuries are not fairly traceable to defendants but rather to the AP.

First, there is no dispute that the publication of the documents and the publicity of a so-called "Program" about which plaintiffs complain was the sole result of the AP publishing the documents along with a series of articles based upon their own interpretation of the documents.[12]    When the AP published some of the documents, for example the Newark report, it did so without redacting the names or addresses of the entities therein.   J.A.-214-15 (Farrell Decl. ¶3).   There is no allegation anywhere in the amended complaint that the NYPD released the documents which contain identifying information (for some of the plaintiffs) or otherwise publicized the details of a "spying program" or publicized any information about plaintiffs.

Second, nowhere in the amended complaint do plaintiffs allege that they suffered any harm prior to the unauthorized release of the documents by the

---

[12] On a motion to dismiss pursuant to 12(b)(1) for lack of subject matter jurisdiction, the Court is allowed to consider facts outside the complaint.   *See Sandy Hook Watermans Alliance, Inc. v. N.J. Sports & Exposition Auth.*, No.: 11-813(FLW), 2011 U.S. Dist. LEXIS 79488, *2 (D.N.J. July 20, 2011) (court may properly consider documents specifically referenced in the complaint, as well as documents that are part of the public record).

Associated Press.   Indeed, despite the Program's alleged existence since 2002, and

the creation of the Newark report in 2007, plaintiffs never claimed injury (or brought

suit) until 2012—only after the AP's publication of the documents and series of

articles beginning in 2011.   *See, e.g.*, J.A.-25, 28-29, 30-31, 35, 40-41, 214, ¶¶ 5,

15, 19, 20, 21, 31, 45.   Moreover, plaintiffs explicitly aver that their alleged injuries

"followed the disclosure" of various documents such as the "Newark" report which

"has been widely publicized."   *Id.*   Thus, if plaintiffs have suffered any injury, it is

from the unauthorized disclosure of the documents by the Associated Press, which

failed to redact identifying information—not the NYPD's actions.   *See*, *e.g.*, *Lundy

v. Hochberg*, 91 Fed. Appx. 739, 744 (3d Cir. 2003) (holding that plaintiff did not

have standing where his injury resulted from the independent action of a party not

before the court); *Duquesne Light Co. v. United States EPA*, 166 F.3d 609, 613 (3d

Cir. 1999) (same); *Hartz Mt. Indus., Inc. v. Polo*, No. 05-2530 (JAP), 2005 U.S.

Dist. LEXIS 25411, at *31-33 (D.N.J. October 26, 2005) (same); *see also Shakman

v. Dunne*, 829 F.2d 1387, 1396-97 (7th Cir. 1987) (finding the line of causation

between the appellants' activity and the appellees' asserted injury to be particularly

attenuated, stating that "[t]he Supreme Court of the United States has stressed that

the 'links in the chain of causation between the challenged Government conduct and

the asserted injury,' are especially weak when the causal connection depends on

many independent decisions of third parties.") (citing *Allen v. Wright*, 468 U.S. at 759)). Plaintiffs' arguments to the contrary are unavailing. Plaintiffs' argument that the "mere occurrence of a discriminatory classification" constitutes an "injury in fact" independent of the AP's disclosure is misplaced because plaintiffs have not pled a discriminatory classification (Point III *infra*), did not suffer an "injury in fact" (Point I *supra*), and their own allegations make clear the injury they claim occurred only after the release of the documents by the AP.

Plaintiffs next argue that the NYPD's actions are "plainly a 'but for' cause of plaintiffs injuries." Appellants' Br. 24-25. Plaintiffs overstate the scope of the 'but for" causation for purposes of standing by claiming "it is well established that the presence of a third party does not break the causal chain for standing purposes." Appellants' Br. 24 (citing *Bennett v. Spear*, 520 U.S. 154, 168-169 (1997)). *Bennett* does not stand for such an open ended proposition because *Bennett* recognizes that standing is not established "if the injury complained of is 'the result [of] the *independent* action of some third party not before the court . . . .'" *Bennett*, 520 U.S. at 169 (quoting *Lujan*, 504 U.S. at 560-61).

The Third Circuit's holding in *Philadelphia Yearly* illustrates this point. The Third Circuit first found that allegations of a surveillance program that created records about plaintiffs was not enough to allege an injury in fact to establish

40

standing.   519 F.2d at 1338.   The Court did find, however, that the disclosure by the Philadelphia Police Department on nationwide television that plaintiffs were the subjects of police dossiers provided the additional allegations necessary to confer standing.   Specifically, the Circuit stated that "[w]e think plaintiffs' allegations of specific identification of most of the plaintiffs in the television broadcast, when joined with the absence of a lawful purpose, make an adequate showing" to establish standing at the pleading stage.   *Id*. at 1339.   Here, there is no allegation that defendant City specifically identified plaintiffs publicly or took any other act to injure plaintiffs.[13]

The one exception to the principle of independent action is if the independent action was the result of a coercive or determinative effect.   *Bennett,* 520 U.S. at 169. Plaintiffs do not, and cannot, argue that the AP's unauthorized disclosure of unredacted documents was due to coercive effect by defendant so that exception is not applicable here.   The cases relied upon by plaintiffs are distinguishable because they involve that inapplicable exception.   *See* Appellants' Br. 25; *see also*, *Pitt News v. Fisher*, 215 F.3d 354, 360-61(3d Cir. 1999) (the third-parties' compliance with a statute's directive caused plaintiff to suffer alleged injuries).

---

[13] As noted *supra*, the Third Circuit stated that even the publication of the information did not allege a "concrete" injury.

Plaintiffs next argue that they could also satisfy the proximate cause standard in this case because it was foreseeable that defendants' surveillance program would attract the attention of reporters and the public.   A third party's act is an intervening, superseding cause if it was either unforeseeable, or was foreseeable but conducted in an extraordinarily negligent manner.   *See Rotenberg v. Lake Charter Bus Corp.*, No. 12-2155 (FLW), 2014 U.S. Dist. LEXIS 9082, at *19 (D.N.J. January 24, 2014) (quoting *Flint v. Langer Transp. Corp.*, 762 F.Supp.2d 735, 740 (D.N.J. 2011), *aff'd,* 480 Fed. Appx. 149 (3d Cir. 2012).   Further, a superseding cause will exist if it had an independent origin and was not foreseeable.   *McKenna v. City of Philadelphia*, 649 F.3d 171, 178 (3d Cir. 2011) (citation omitted).   The Associated Press' disclosure of the surveillance program was unrelated to any actions by the defendant.   Further, it was not foreseeable that the Associated Press would disclose documents pertaining to the program.   Even assuming that the act of disclosure by the Associated Press was foreseeable, it was still not foreseeable that the AP would not redact personal identifying information of plaintiffs thereby causing them to allegedly sustain injuries.

Plaintiffs' last argument is that because the City has made comments regarding the NYPD's alleged surveillance program, these comments somehow ratify the existence of a facially discriminatory surveillance policy and

42

practice.  This is clearly not the case, as none of the NYPD's public comments identified the details of the alleged "program," identified plaintiffs, or identified any of the few facts plaintiffs allege exist in the records.  J.A.-59-69, 203-212 (Katon Decl. Ex. A, B, D, E, F.)

## POINT III

### THE DISTRICT COURT ALSO PROPERLY FOUND THAT PLAINTIFFS' ALLEGATIONS OF PURPOSEFUL DISCRIMINATION FAIL TO MAKE OUT A PLAUSIBLE CLAIM

The District Court correctly held that, in addition to failing for lack of standing, the amended complaint fails.   At the heart of the amended complaint is an implausible assumption made by plaintiffs: that the NYPD began a "surveillance program" of Muslims soon after the terror attacks of September 11, 2001 *solely on the basis of religion*.  There is no allegation in the amended complaint that the NYPD took any action against Muslims generally, or the plaintiffs individually, other than surveillance in public places.

Notably, the amended complaint never asserts that these alleged acts of surveillance—the sole basis for plaintiffs' desired inference of intentional discrimination based solely on religion—by themselves are in any way unconstitutional.  Indeed, they are not.  *See Laird*, 408 U.S. at 12-14 (denying injunction to stop, among other things, surveillance by Army intelligence officers at

public meeting); *Philadelphia Yearly*, 519 F.2d at1337 (3d Cir. 1975) (allegations of "police photographing and data gathering at public meetings" failed to state a claim). *Handschu v. Special Servs. Div.*, 349 F.Supp.766, 769 (S.D.N.Y. 1972) ("The use of informers and infiltrators by itself does not give rise to any claim of violation of constitutional rights.").

Nor does the Constitution prohibit the retention of the information obtained from surveillance. *Philadelphia Yearly*, 519 F.2d at 1337-38 (affirming dismissal of complaint in respect to allegations that police maintained files on plaintiffs and shared that information with other law enforcement agencies); *Donohoe v. Duling*, 465 F.2d 196, 202 (4th Cir. 1972) (denying injunction where record showed police department maintained photographs in its files).   In other words, all of the NYPD's alleged surveillance activities—mapping restaurants, businesses and mosques, creating records, and the like—are all constitutional on their face.

Not only is the Program plaintiffs describe in and of itself not unconstitutional, according to a three month fact finding investigation by the New Jersey Attorney General, the surveillance Program did not violate New Jersey civil or criminal law.   J.A.-219 (Farrell Decl. Ex. B, 1).

Plaintiffs' legal claims, based on violations of the First and Fourteenth Amendments, hinge upon the implausible assumption plaintiffs assign to what is

44

otherwise lawful surveillance—that the surveillance was done **_solely_** because of religion.   Other than the lawful surveillance, there are no non-conclusory allegations to support plaintiffs' assumption that the NYPD's actions were driven solely because of religion.   For example, there is no allegation that the NYPD had an express, explicit, or written policy to surveil Muslims based solely upon their religion.   Nor is there any allegation that the NYPD took any actions post surveillance to injure the plaintiffs or the Muslim community.   Plaintiffs' allegations are simply not plausible.

As the District Court found, the Supreme Court's decision in *Iqbal* is particularly instructive here because both cases grow out of the same tensions between security and the treatment of Muslims that is particular to the post-September 11 time period.   *Iqbal* arose out of the federal government's response to the terrorist attacks on September 11, 2001, the same as plaintiffs' allege here.   Both cases involve claims of intentional discrimination on the basis of religion.   Similar to what the plaintiffs here have alleged, the plaintiff in *Iqbal* alleged in his complaint that he was subject to harsh conditions of confinement after his arrest "'as a matter of policy, solely on account of [his] religion, race, and/or national origin . . . .'"   *Iqbal*, 556 U.S. at 680 (alteration in original).

The Supreme Court in *Iqbal* found that "purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences.'" *Id.* at 676 (quoting *Pers. Adm'r of Mass v. Feeney*, 442 U.S. 256, 279 (1979)).[14]  The Supreme Court held that discriminatory purpose "instead involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Id.* at 676-77 (alteration in original) (quotations omitted) (quoting *Feeney*, 442 U.S. at 279)).   Applying that test to the case before it,  the Supreme Court held that the "respondent must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin."  *Id.* at 677.[15]

---

[14]  Contrary to what plaintiffs appear to be arguing, it is well-settled law that "proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977); *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005) ("'Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection clause.'" (quoting *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003)).   As this Court has stated—"to make out *any* claim for discrimination (under the FHAA or another law) the improper "basis" must be shown to be at the heart of the classification or conduct."  *Cmty. Servs. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 178n.7 (3d Cir. 2005).

[15]  Although *Iqbal* involved a First and Fifth Amendment invidious discrimination claim, it is well-settled law that the Fifth Amendment discrimination analysis is the

The Supreme Court held that plaintiff's allegation—that plaintiff was confined "'as a matter of policy, solely on account of [his] religion, race, and/or national origin'" was conclusory and not entitled to be assumed true.  *Id.* at 680-81 (alteration in original).  Once the Court eliminated all of plaintiffs' conclusory allegations in *Iqbal*, the Court found that while plaintiff's factual allegations were consistent with his conclusory claim of purposeful discrimination, because there was a more likely explanation, the plaintiffs' allegations did not plausibly establish discriminatory purpose.  *Id.* at 681.  In other words, Iqbal "ha[d] not 'nudged [his] claims' of invidious discrimination 'across the line from conceivable to plausible.'"  *Id.* at 680 (second alteration in original) (quoting *Twombly*, 550 U.S. at 570).

The Supreme Court relied upon the following facts in reaching its conclusion that there was a more likely purpose for the FBI's actions than discrimination.  The Court observed:

same as the Fourteenth Amendment analysis.  *See Adarand Constructors v. Pena*, 515 U.S. 200, 217-18 (1995)("'[T]his Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.'" (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975));  *Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").  Thus, plaintiffs' suggestion that *Iqbal* is somehow inapplicable to the case here is incorrect.

> The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group. Al Qaeda was headed by another Arab Muslim—Osama bin Laden—and composed in large part of his Arab Muslim disciples. It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims.

*Id*. at 682.

In sum, the Supreme Court concluded that the allegations of the arrest, detention, and holding of thousands of Arab Muslim men in highly restrictive conditions of confinement were insufficient to plausibly infer that those acts were motivated based upon the detainees' religion. *See id.* at 680-81.

Applying the legal standards and logic set out in *Iqbal* and *Twombly*, the District Court here correctly arrived at the same conclusion as the Supreme Court in *Iqbal*. Specifically, the District Court identified the issue to be decided as "plausibility" and recognized that "plausibility" is not the same as "probability." J.A.-20. It next correctly recognized that its determination of plausibility requires the reviewing court to draw on its judicial experience and common sense. The District Court then held that for similar reasons as set forth in *Iqbal*, the plaintiffs in this case have not alleged facts from which it can be "plausibly inferred" that they

were targeted solely because of their religion.[16]  J.A.-21.  The Court found that "[t]he more likely explanation for the surveillance was a desire to locate budding terrorist conspiracies."  J.A.-21.  The Court stated that "the most obvious reason" for reaching that conclusion is because the surveillance is alleged to have begun just after the 9/11 terror attacks and that "[t]he police could not have monitored New Jersey for Muslim terrorist activities without monitoring the Muslim community itself."  J.A.-21.

Additional allegations made by plaintiffs also support the conclusion that the more likely explanation for the NYPD's actions is public safety rather than discrimination based upon religion.   For example, plaintiffs allege that the Program was directed at not just mosques but also Muslim restaurants, retail stores, schools, and associations and on the individuals who own, operate or visit those establishments and that the NYPD created over twenty precinct-level maps of the

---

[16] Plaintiffs also argue that the "district court's decision itself appears to acknowledge that the motive for the NYPD's surveillance policy was at least in part discriminatory toward Muslims: 'the motive for the Program was not solely to discriminate against Muslims.'" Appellants' Br. 38.  Plaintiffs' argument ignores the obvious which is that plaintiffs are the ones who alleged throughout their complaint that the discrimination was based *solely* on their religious status and the Court was echoing plaintiffs' allegation.

City of Newark.   Plaintiffs further allege that the NYPD has identified twenty-eight "ancestries of interest" and that the NYPD identified where those ancestries congregate and which businesses they visit. These allegations support the more likely explanation that the NYPD's goal was to understand where a foreign or domestic Islamist radicalized to violence might try and conceal himself or attempt to recruit others to assist him.   A comprehensive understanding of the makeup of the community would help the NYPD figure out where to look—and where not to look—in the event it received information that an Islamist radicalized to violence may be secreting himself in New Jersey.   In fact, it would be irresponsible for the NYPD not to have an understanding of the varied mosaic that is the Muslim community to respond to such threats.

Federal law enforcement recognizes these legitimate purposes.   For instance, the FBI's Domestic Investigations and Operations Guide ("DIOG") explicitly permits the FBI to identify locations of concentrated ethnic communities to aid in the analysis of potential threats and vulnerabilities and to assist in domain awareness.   One specific example in the DIOG of when this type of domain

awareness is useful is to know "where identified terrorist subjects from certain countries may relocate to blend in and avoid detection."[17]

Plaintiffs' allegations regarding two NYPD reports—a February 2006 report on discussions about the controversy surrounding the publication of a Danish artist's cartoons of the Prophet Muhammad and an October 2006 report after a plane crash in Manhattan—similarly demonstrate the obvious legitimate law enforcement purpose behind them.   The Danish cartoon on the Prophet Muhammad was widely publicized, causing strong reactions, some violent and deadly, in other countries. J.A.-215, 221-32 (Farrell Decl. ¶ 5; Farrell Decl. Ex. C).   That the NYPD thereafter gauged the reactions to the cartoon in local communities to assess the possibility of unlawful conduct or violence here is more likely for the purpose of ensuring public safety than purposeful discrimination on the basis of religion.   The same is true of the 2006 plane crash report.   Because it involved a plane flown into a Manhattan

---

[17] *See* Dep't of Justice, Fed. Bureau of Investigation, *Domestic Investigations and Operations Guide* § 4.3(B)(2)(a) (2008), http://vault.fbi.gov/FBI%20Domestic% 20Investigations%20and%20Operations%20Guide%20%28DIOG%29/fbi-domesti c-investigations-and-operations-guide-diog-2008-version; Dep't of Justice, Fed. Bureau of Investigation, *Domestic Investigations and Operations Guide* § 4.3.3.2.1 (2011), http://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20 Operations%20Guide%20(DIOG)/fbi-domestic-investigations-and-operatio ns-guide-diog-2011-version/fbi-domestic-investigations-and-operations-guide -diog-october-15-2011-part-01-of-03

building just as in 9/11, prudent policing for public safety would have the NYPD collecting information about the 2006 incident. Accordingly, plaintiffs' amended complaint contains numerous allegations that support the more likely purpose for the NYPD's activities.  *See George v. Rehiel*, 738 F.3d 562, 586 (3d Cir. 2013) (there was "an obvious alternative explanation" for the conduct upon which plaintiffs sought to draw an inference of First Amendment retaliation); *Doe v. Sizewise Rentals, LLC,* 530 Fed. Appx. 171, 174 (3d Cir. 2013) (plaintiffs' factual allegations did not give rise to an inference of discrimination in a discriminatory discharge claim) (citing *Iqbal*, 556 U.S. 686-87); 16630 *Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013) (allegations in the complaint did not support an inference of discrimination in light of "a more obvious explanation").

Finally, plaintiffs' reliance on statements made by the Mayor of New York City and the Police Commissioner to support the inference they seek is not supported by the actual statements.  *See, e.g.*, J.A.-55 (Katon Decl. ¶ 3(c)) (Police Commissioner Raymond Kelly stated: "We did that demographic study [Newark Report], if you will, in Newark with the acquiescence, with the knowledge of law enforcement personnel in Newark, and we gave them a copy"); *Id.* (Katon Decl. ¶ 3(d)) (Police Commissioner stated "I think this is the type of information that helps us do our job. It gives us a total picture, context, of a particular neighborhood.");

J.A.-59 (Katon Decl. Ex. A, 1) (AP article dated March 9, 2012 quotes Mayor Bloomberg: "We don't stop to think about the religion . . . . We stop to think about the threats and focus our efforts there."); J.A.-211 (Katon Decl. Ex. F, 1) (AP article dated February 24, 2012 quotes Mayor Bloomberg "The NYPD is trying to stop terrorism in the entire region . . . .").

A.    **The Court Properly Considered the "More Likely Explanation" When Determining the Plausibility of Plaintiffs' Claims**

Plaintiffs' argue that the district court can never discuss or find "a more likely explanation" in assessing plausibility.  *See* Appellants' Br. 40. That argument ignores the Supreme Court's holding in *Iqbal* and its progeny.   The Supreme Court in *Iqbal* used the phrase "more likely explanation" when it held plaintiffs' claim implausible.  *Iqbal*, 556 U.S. at 681 ("[G]iven more likely explanations, they do not plausibly establish this [discriminatory] purpose.").  Courts also routinely use the interchangeable phrase "obvious alternative explanation" in analyzing plausibility. *Twombly*, 550 U.S. at 566-67  (plaintiff failed to state a claim where there was an "obvious alternative explanation" for the alleged conspiracy); *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) ("Importantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct

53

rather than the unlawful conduct the plaintiff would ask the court to infer.") (quoting

*Iqbal*, 556 U.S. at 682).   Plaintiffs' argument to the contrary has no basis in law.

**B.     The District Court Did Not Choose Between Two Plausible Explanations**

Plaintiffs argue that the Court applied the wrong standard and picked between

two probabilities.   *See* Appellants' Br. 36-40.   Plaintiffs ignore the explicit

wording of the opinion which sets forth the proper legal test and, as just discussed,

held that the amended complaint does not allege sufficient facts from which it can be

"***plausibly inferred***" that plaintiffs were targeted solely because of their religion.

J.A.-21. The Court was not making a probability determination between two

competing plausible explanations. To the contrary, it deemed plaintiffs' assumption

of discriminatory purpose implausible.

**C.     Plaintiffs' Argument That the Factual Allegations in the Complaint State a Facially Discriminatory Government Classification and Thus Conclusively Establish Purposeful Discrimination Should Be Rejected**

Plaintiffs argue that the amended complaint pleads a facially discriminatory

classification and thus, *ipso facto*, it states a plausible claim for intentional

discrimination.   *See* Appellants' Br. 31-43.   Under that scenario, Plaintiffs argue

the District Court erred in conducting a plausibility test and examining whether there

was a more obvious explanation for the conduct than a discriminatory purpose.   *Id.*

54

Contrary to their argument, plaintiffs have not plead a facially discriminatory classification. There is no allegation in the amended complaint that the NYPD had an express or explicit written or oral policy to surveil Muslims based solely upon their religion. Plaintiffs' own allegations confirm this point when they assert that the Program "***reflects*** a policy, custom, usage and/or practice of the NYPD to target the Muslim community for surveillance solely on the basis of religion." J.A.-37, ¶36.[18]

Moreover, as *Iqbal* makes clear, allegations in a complaint such as "'as a matter of policy, solely on account of [his] religion, race, or nation origin . . . .'" are conclusory and not entitled to be assumed true. 556 U.S. at 680-81; *see also Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 74 (3d Cir. 2011) ("[T]he broad allegations regarding the existence of a 'culture of lawlessness' are accorded little if any weight in our analysis."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997) ( a court "need not credit [either] 'bald assertions' or 'legal conclusions'" in the complaint when deciding a motion to dismiss (quoting *Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996)).

---

[18]In all the cases relied upon by the plaintiffs to support their argument that they have a facially discriminatory classification, there was an express, explicit or written statute, law, order, or policy which classified on the basis of race.

55

Similar conclusory allegations are spread throughout plaintiffs' amended complaint here and as a matter of law cannot be credited.  Once the conclusory allegations are pushed aside, the remaining factual allegations are insufficient to find a facially discriminatory classification is plead or to plausibly draw an inference of discriminatory purpose for all the reason previously set forth.   At the end of the day, even plaintiffs agree that the district court should assess plaintiffs' allegations "to see whether they plausibly support the claim of purposeful discrimination." Appellants' Br. 38.   The District Court was correct when it found they do not.

The conclusion that plaintiffs have failed to plead a facially discriminatory classification is demonstrated by the similarity of the conclusory allegations here to those in *Iqbal*.   As set forth *supra*, the claim of intentional discrimination set forth in *Iqbal*—that a policy was carried out solely on the basis of religion – is identical to the claim here—that a policy was carried out solely on the basis of religion. Accordingly, either plaintiffs here have not alleged a facially discriminatory classification, or if they have, then *Iqbal* similarly involved one.   In either event, the outcome is the same.   The alleged discriminatory purpose is not plausible in the face of the more obvious alternative explanation for the NYPD's actions.  *See DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 727-28 (3d Cir. 1995) (stating that "the touchstone of explicit facial discrimination is that the discrimination is

56

apparent from the terms of the policy itself" and holding that the policy at issue was not a facially discriminatory classification), *reh'g denied*, No. 94-1530, 1995 U.S. App. LEXIS 5896, at *1 (3d Cir. 1995).[19]

Although plaintiffs allege in conclusory terms that NYPD classified them differently on the basis of religion, their substantive allegations show at most that, in practice, their communities were surveilled when others were not. But that is an allegation of discriminatory effect, not discriminatory purpose. *See Iqbal*, 556 U.S. at 682 ("It should come as no surprise that a legitimate policy . . . would produce a disparate, incidental impact on Arab Muslims . . . ."); *Feeney*, 442 U.S. at 274 (in a disparate impact claim, it is "purposeful discrimination" that runs afoul of the Constitution); *Washington v. Davis*, 426 U.S. 229, 239 (1976) ("But our cases have not embraced the proposition that a law or other official act, without regard to

---

[19] To the extent plaintiffs rely upon their allegation that others similarly situated have been treated differently, this allegation is conclusory and should not be credited. Persons are similarly situated under the Equal Protection Clause when they are alike "in all relevant respects." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see also Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008). The only allegation here is a bare conclusory assertion that individuals of other religions have not been surveilled and that is insufficient. *See County Concrete Corp. v. Twp. of Roxbury,* 442 F.3d 159, 171 (3d. Cir. 2006) (dismissing plaintiffs' equal protection claim on 12(b)(6) grounds because plaintiff's conclusory allegations that he was treated differently from others similarly situated did not offer any facts demonstrating how those others were similarly situated, or were treated differently).

whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact."); *Lower Merion*, 665 F.3d at 549-54 (in order to show that a school redistricting plan discriminated on the basis of race, plaintiffs had to demonstrate both a discriminatory purpose and a disparate impact of which they showed neither); *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002) ("To make an equal protection claim in the profiling context, Bradley was required to prove that the actions of customs officials (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose.").[20]

Finally, the significant flaw in plaintiffs' argument is that they have conflated discriminatory purpose with awareness of religion and thus argue that strict scrutiny is warranted. But as this Court has recognized, it is not when race or religion is a motivating factor that strict scrutiny is applied, but rather, when a discriminatory purpose based on race or religion is a motivating factor. The difference is of the

---

[20] The same holds true for plaintiffs' allegations that they have alleged a classification that violates the Free Exercise and Establishment Clauses of the First Amendment because such claims also require a showing of discriminatory purpose. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 540 (1993) ("Here, as in equal protection cases, we may determine the city council's object from both direct and circumstantial evidence.")); *Lemon v. Kurtzman,* 403 U.S. 602, 612-13 (1971) (in order to survive an Establishment Clause challenge, the government practice must (1) have a secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) not foster excessive state entanglement with religion).

58

utmost significance because a discriminatory purpose means that the decisionmaker adopted the challenged action because the action would benefit or burden an identifiable group. *Cf. Iqbal*, 556 U.S. at 676-77. As this Court has held in the context of allegations involving racial discrimination, the "mere awareness or consideration of race should not be mistaken for racially discriminatory intent or for proof of an equal protection violation." *Lower Merion*, 665 F.3d at 548 (finding there was no discriminatory purpose and districting plan was only subject to rational basis review).

For all these reasons, the District Court correctly concluded that it was not plausible to infer a discriminatory purpose for the NYPD's alleged actions because of the obvious alternative explanation.[21]

---

[21] Finally, this is not a case where the Court should allow discovery to proceed under the theory that the case can always be dismissed later. To allow discovery to proceed would be unfair and burdensome to both defendant City and the court. *See, e.g.*, *In Re The City of New York*, 607 F.3d 923, 949-51 (2d Cir. 2010) (after several years of litigation over plaintiffs' requests for sensitive NYPD Intelligence Bureau documents, the Second Circuit granted the City's petition for a writ of mandamus and instructed the District Court to deny plaintiffs' motion to compel the production of the Intelligence Bureau documents at issue).

D.     **Iqbal Applies With Equal Force to Bivens and Monell Claims**

Plaintiffs argue that *Iqbal* and *Twombly* are inapplicable to the present amended complaint because it alleges a *Monell* claim.   Appellants' Br. 40-42. Contrary to plaintiffs' argument, the plausibility standard set out in *Iqbal* applies regardless of whether the defendant is an individual or a municipality.  *See, e.g.*, *Rees v. Office of Children and Youth*, 473 Fed. Appx. 139, 144 (3d Cir. 2012) (citing *Iqbal* and affirming District Court's dismissal of plaintiff's *Monell* claim against the Office of Children and Youth as the allegations set forth in plaintiff's complaint were insufficient to establish a policy or custom of deliberate indifference to plaintiff's constitutional rights); *McTernan v. City of York*, 564 F.3d 636, 657-59 (3rd Cir. 2009) (applying *Twombly* and affirming dismissal of plaintiff's *Monell* claim against the City of York); *Garcia v. City of Paterson*, No. 11-cv-6587 (CCC-JAD), 2012 U.S. Dist. LEXIS 132515, at *11-14 (D.N.J. Sept. 17, 2012) (dismissing plaintiff's *Monell* claims under *Iqbal*).   The plausibility standard also applies regardless of the type of claim alleged.  *See Iqbal*, 556 U.S. at 684 ("Our decision in Twombly expounded the pleading standard for 'all civil actions,' and it applies to antitrust and discrimination suits alike.") (citations omitted).

**E.**     **Policy Arguments Are Not Applicable On A Motion To Dismiss___**

Plaintiffs and Amici make various policy arguments regarding the alleged "Program" of surveillance. Those arguments are not germane to the narrow legal issues presented on this appeal and should not be considered. *See Laird*, 408 U.S. at 15 ("We, of course, intimate no view with respect to the propriety or desirability, from a policy standpoint, of the challenged activities of the Department of the Army; our conclusion is a narrow one, namely, that on this record the respondents have not presented a case for resolution by the courts."). Any remaining arguments in the amicus briefs are duplicative of plaintiffs' arguments and have been addressed *supra*.

61

## <u>CONCLUSION</u>

For the foregoing reasons, Appellee the City of New York respectfully requests that the February 20, 2014 Order of the District Court be affirmed.

Dated:       October 6, 2014
             New York, New York

                              Respectfully submitted,
                              ZACHARY W. CARTER
                              Corporation Counsel of the City of
                                New York
                              100 Church Street
                              New York, New York 10007
                              212-356-3532


                                 <u>s/Peter G. Farrell</u>
                              By:  Peter G. Farrell

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

I hereby certify that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

Dated:  October 6, 2014
        New York, New York


                *s/* Peter G. Farrell
                By: Peter G. Farrell


## <u>CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS</u>

The text of the electronic brief and text of the paper copies of this brief are identical.

Dated:  October 6, 2014
        New York, New York

                *s/* Peter G. Farrell
                By: Peter G. Farrell

## <u>CERTIFICATION OF VIRAL SCAN</u>

The text of the electronic brief was prepared on a computer that is automatically protected by a virus detection program, namely a continuously-updated version of McAfee VirusScan Enterprise + AntiSpyware Enterprise 8.8, and no viruses were detected.

Dated:  October 6, 2014
        New York, New York

<u>*s/* Peter G. Farrell</u>
By: Peter G. Farrell

**<u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>**
**Certificate of Compliance With Type-Volume Limitation,**
**Typeface Requirements and Type Style Requirements**

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because:

[X ] this brief contains 13,950 words excluding the parts of the brief exempted by Fed.R.App. P. 32(a)(7)(B)(iii); or

[   ] this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App. P. 32(a)(6) because:

[ X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, Version 14.0.6023.1000 in Times New Roman typeface with 14-point font, or

[   ] this brief has been prepared in a monospaced typeface using Microsoft Word 2010, Version 14.0.6023.1000 with Courier typeface.

Dated:  October 6, 2014
         New York, New York

                    *s/* Peter G. Farrell
                    By: Peter G. Farrell

## CERTIFICATION OF FILING AND SERVICE

I hereby certify I am filing the foregoing Brief of Appellee electronically via this Court's electronic filing system, and by thereafter serving ten paper copies of the Brief of Appellee, by first-class mail, to the Clerk of the United States Court of Appeals for the Third Circuit.

I also certify that Appellants/Plaintiffs are Filing Users, and that on October 6, 2014, the Brief of Appellee was served electronically by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system on all counsel of record for Appellants/Plaintiffs.

Dated:  October 6, 2014
        New York, New York

                        _s/_ Peter G. Farrell
                        By: Peter G. Farrell