UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
NO. 14-1688

SYED FARHAJ HASSAN; THE COUNCIL OF
IMAMS IN NEW JERSEY; MUSLIM STUDENTS
ASSOCIATION OF THE U.S. AND CANADA, INC.;
ALL BODY SHOP INSIDE & OUTSIDE; UNITY BEEF
SAUSAGE COMPANY, et al.,
      Appellants


      v.


THE CITY OF NEW YORK



            Transcript from the audio recording of

the oral argument held Tuesday, January 13, 2015 at

the United States Courthouse, 601 Market Street,

Philadelphia, Pennsylvania.  This transcript was

produced by James DeCrescenzo, a Fellow of the

Academy of Professional Reporters, a Registered

Diplomate Reporter, an Approved Reporter of the

United States District Court.


BEFORE:

         THE HONORABLE THOMAS L. AMBRO

         THE HONORABLE JULIO M. FUENTES

         THE HONORABLE JANE R. ROTH

1    APPEARANCES:

2    BAHER A. AZMY, ESQUIRE
     bazmy@ccrjustice.org
3    CENTER FOR CONSTITUTIONAL RIGHTS
     666 Broadway
4    7th Floor
     New York, New York  10012
5    212.614.6427
          Counsel for Appellant
6

7

8    PETER G. FARRELL, ESQUIRE
     pfarrell@law.nyc.gov
9    NEW YORK CITY LAW DEPARTMENT
     100 Church Street
10   New York, New York 10007
     212.356.3532
11        Counsel for Appellee

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              THE COURT: The first case we have

 2   before us this morning is Hassan et al. v. City of

 3   New York, number 14-1688.  Mr. Azmy, am I

 4   pronouncing it correctly?

 5              MR. AZMY:  Yes, your Honor.

 6              THE COURT:  Azmy?

 7              MR. AZMY:  Yes.

 8              THE COURT:  And Mr. Farrell.

 9              MR. AZMY:  Good morning.  May it

10   please the Court, Baher Azmy from the Center for

11   Constitutional Rights, along with co-counsel Muslim

12   Advocates and Gibbons PC on behalf of plaintiffs.

13              With the court's permission I would

14   like to reserve two minutes for rebuttal.

15              THE COURT:  No problem at all.

16              MR. AZMY:  Your Honors, in this case

17   the district court failed to evaluate, let alone

18   credit, plaintiff's well-pled allegations that they

19   were subject to a facially discriminatory city

20   policy.

21              THE COURT:  What is the policy?  I've

22   looked for a policy.  You seem to have assumed that

23   there is surveillance, there is a policy of

24   surveillance for Muslims, but you don't point to
```

1    anything that has been said or written to

2    demonstrate such a policy.

3            MR. AZMY:  Well, under Monell, your

4    Honor, we don't need to demonstrate, particularly

5    at the pleading stage, that we have a formal

6    written decree.  We can show a policy or a custom

7    or a usage.  And we've pled ample facts

8    demonstrating that the city has singled out Muslims

9    alone for differential treatment.  And the scope of

10    the program certainly supports, at the pleading

11    stage, the notion that there is a policy or a

12    custom.

13            THE COURT:  But what has happened

14    since 9/11, and more importantly in Paris the other

15    day, indicates that there are legitimate police

16    investigatory reasons for this surveillance.

17            MR. AZMY:  We respectfully disagree,

18    your Honor.  We take no issue with the notion that

19    there are serious security threats in this world,

20    including threats from terrorism and those who

21    identify as Muslim terrorists.  But the question is

22    what means do the law enforcement use to, quote,

23    investigate.

24            This is actually, this is a

1    blunderbuss, suspicionless program, based on

2    nothing other than individuals' religiosity.  It's

3    not based on any indicia of suspicion whatsoever.

4              THE COURT:  Can you have a

5    constitutional injury if all the alleged

6    surveillance occurred in public places or places to

7    which the public was invited?

8              MR. AZMY:  You can, your Honor, if the

9    surveillance is based on a discriminatory

10   classification.  That's Judge Roth's opinion in

11   Anderson v. Davila.  The injury, the Supreme Court

12   has repeatedly recognized, comes from being

13   classified on the basis of a protected

14   characteristic.  That's what's true in the

15   affirmative action cases, the racial gerrymandering

16   cases.

17             And I would stress in particular this

18   court's decision in Hall v. Pennsylvania State

19   Police from 1978.  That case involved the police

20   requiring a bank to surveil all, quote, suspicious

21   males entering the bank.

22             The court recognized that suspicion of

23   everyone -- sorry, surveillance of anyone would not

24   be constitutionally problematic.  But singling out

1    surveillance on the basis of a protected

2    characteristic, in and of itself, states a claim

3    and is sufficient injury.  And the same would apply

4    in this case where --

5                    THE COURT:  When you say a claim, are

6    we talking about a subjective chill in plaintiffs'

7    rights and activities as in Laird?

8                    MR. AZMY:  No, your Honor.  In Laird,

9    what's very clear about Laird is that the

10   plaintiffs there, all they challenged was the,

11   quote, mere existence, without more of an Army data

12   gathering program.  They could do nothing to

13   connect the program to any personal injury.  All

14   they alleged was a vague and totally speculative

15   chill to some unspecified First Amendment

16   activities in the future.

17                   And Anderson v. Davila distinguishes

18   Laird.

19                   THE COURT:  Davila.

20                   MR. AZMY:  Excuse me?

21                   THE COURT:  Davila.

22                   MR. AZMY:  Davila.  Excuse me.  You

23   remember it well.  -- distinguishes Laird and

24   Philadelphia Yearly on that basis, where

```
 1    classification is an injury.

 2              In addition, unlike the Laird

 3    plaintiffs, in addition to the classification, they

 4    allege present harm to their religious activities.

 5              The institutional plaintiffs, the

 6    mosques who were in fact subject to surveillance,

 7    allege that they experienced a decrease in

 8    congregants and MFI plaintiff alleges that they had

 9    to change their programming in response to the

10    surveillance program.

11              And the Presbyterian Church case from

12    the Ninth Circuit says that surveillance that

13    decreases the ability of an institution to fulfill

14    its religious mission states an injury in fact.

15              THE COURT:  In response to Judge Roth

16    you mentioned that a policy need not be shown at

17    this stage of the proceedings.  And if I heard you

18    correctly, you mentioned that you only need a

19    policy, a custom or a practice; is that correct?

20              MR. AZMY:  Yes.  Custom, practice,

21    custom and usage.

22              THE COURT:  I might have missed your

23    answer, which one is it that you are asserting in

24    this case?
```

```
 1              MR. AZMY:  We allege both, your Honor,

 2    and I think we're entitled to do that and --

 3              THE COURT:  Both of?

 4              MR. AZMY:  Both the policy -- we

 5    allege policy or custom at the pleading stage.  And

 6    of course we can allege alternate theories.

 7              THE COURT:  Custom in the sense that

 8    the NYPD has a custom of surveilling a certain

 9    group?

10              MR. AZMY:  Yes.  Yes, your Honor.  And

11    that is shown by the sheer --

12              THE COURT:  That is a religious group.

13              MR. AZMY:  Exactly.  The only search

14    criteria here for this program is religion.  And

15    the program of the policy is quite vast.  We allege

16    that it sought to infiltrate every mosque within a

17    250 mile radius, and in fact develop analytical

18    reports on every mosque within a hundred mile

19    radius, including our plaintiffs.

20              They infiltrated houses of worship, we

21    allege took notes of and tried to surveil thousands

22    of sermons through mosque crawlers, photographing,

23    videotaping.  They have so-called rakers

24    surveilling all manner of businesses, particularly
```

**JAMES DeCRESCENZO REPORTING, LLC**

1    in Newark, taking minute detailed accounts of

2    customer behavior, employee behavior, emphasizing

3    religiosity again.

4            They have weekly reports of MSAs,

5    including two MSAs in New Jersey.

6            THE COURT:  Nothing wrong with a

7    police officer from New York City going into a

8    mosque in New Jersey.

9            MR. AZMY:  It is if it's subject to a

10   city policy or custom that only singles out mosques

11   but not churches, MSAs but not Hillel.

12           THE COURT:  Look at Iqbal, for

13   instance, the fact that 9/11 has made us focus upon

14   terrorism among certain extreme Muslim groups.  And

15   how do you find out where they are?  We have

16   learned since then that there's a lot of

17   recruitment of young men in mosques by imams who

18   are giving terrorist-supported sermons and

19   recruiting, sending them to Syria, et cetera.

20           How do you find out where that's going

21   on unless, one, you focus on mosques, you focus on

22   Muslims?  If you go to the Baptist church you

23   aren't really going to find out anything that's

24   relevant, are you?

1          MR. AZMY:  Three responses, your

2     Honor.  First just very quickly, Iqbal really has

3     nothing to do with this.  In Iqbal the problem

4     there was of course pleading.  They could not plead

5     a facially discriminatory policy.

6          THE COURT:  Yes, but it was a case

7     where a Muslim was saying look, you know, I'm in

8     the hot spot because I'm a Muslim and that's not

9     fair.

10          MR. AZMY:  Yes, and he couldn't plead

11     it in the way we have.  There's nothing in Iqbal.

12     In fact Iqbal goes to pains to stress that this

13     policy, which ultimately was just a disparate

14     impact.  There are no allegations, well-pled

15     nonconclusory allegations of a facially

16     discriminatory policy.

17          THE COURT:  Iqbal sounds a lot like

18     Laird.

19          MR. AZMY:  Iqbal, yes, in that sense

20     is Laird.  And they're both distinguishable when we

21     have detailed allegations of discriminatory

22     treatment.

23          THE COURT:  Iqbal, if I remember

24     correctly, was the target of an investigation.  He

1    was already being targeted because of potential

2    relationship to 9/11.

3              MR. AZMY:  Precisely, your Honor.  He

4    was designated a high suspect individual,

5    unlawfully present in this case, pursuant to a

6    neutral investigative program into 9/11.

7              There is no criminal investigation at

8    work here as we allege.  It is blunderbuss

9    suspicion.  And ultimately the question, your

10   Honor, Judge Roth is, these kinds of

11   classifications have to trigger strict scrutiny.

12   They cannot be dismissed on the pleadings.

13             And if the NYPD can demonstrate that

14   it is narrowly tailored and necessary to surveil a

15   Muslim school for eight-year-old girls in order to

16   root out terrorism, they will have every

17   opportunity after discovery and at summary

18   judgment.

19             This case is not over at the

20   pleadings.  We have, consistent with our

21   obligations, and Iqbal, pled what we need to plead

22   to proceed.

23             THE COURT:  Is your complaint, in

24   addition to making a religion-based classification,

1    was it also making an ethnicity-based

2    classification as well?

3                MR. AZMY:  No, your Honor.

4                THE COURT:  At least reading between

5    the lines I thought that might have been the case.

6                MR. AZMY:  It isn't, your Honor.  We

7    allege that there is discrimination on the basis of

8    religion under the equal protection clause,

9    religion as such being protected as a

10   classification under the equal protection clause

11   and under the First Amendment, the establishment

12   and free exercise clause.

13               And if I could just add a couple of

14   our standing allegations.  The classification under

15   the equal protection clause in Hall and all of the

16   affirmative action cases constitute an injury.

17               Also under the establishment clause,

18   the Fourth, Fifth, Ninth, Tenth and Eleventh

19   Circuits following the Supreme Court establishment

20   clause jurisprudence, have all held that when a

21   government policy disfavors or demeans a religion,

22   adherents to that religion suffer stigmatic harm

23   and have standing.  And the Catholic League case in

24   the Ninth Circuit --

```
 1              THE COURT:  Is that an establishment
 2   clause or free exercise?
 3              MR. AZMY:  Those cases are
 4   establishment clause cases.  And the Catholic
 5   League case in the Ninth Circuit, which is en banc
 6   from 2010, as well as the Awad case in the Tenth
 7   Circuit and Moss v. Spartanburg.
 8              THE COURT:  The district court
 9   dismissed the case because of no showing of injury.
10   Or if there is an injury it was not traceable back
11   to the New York police, it was traceable to an
12   article that appeared in the newspapers authored by
13   a writer for the Associated Press.
14              MR. AZMY:  Correct.
15              THE COURT:  Why isn't that an accurate
16   assessment of the injury issue?
17              MR. AZMY:  Well, with respect to the
18   --
19              THE COURT:  The judge said but for the
20   article you would not have known about the program.
21   You wouldn't have suffered injury.
22              MR. AZMY:  Yes.  So with respect to
23   the causation issue, because I think we do detail a
24   number of injuries, with respect to the causation
```

1    injury, the law is fairly clear that the

2    defendants' actions do not need to be the last step

3    in the chain of causation.  And injuries that only

4    emerge as a result of third-party actions are still

5    cognizable.  That's Bennett v. Spears and that's

6    this court's decision at Pitt News.

7            All we need to show is not proximate

8    causation, although we certainly show that, it's

9    but-for causation.  And but for the city's

10   surveillance the AP would have nothing to report

11   on.

12           THE COURT:  Do you assert injuries

13   before the publication of the article?

14           MR. AZMY:  We do, your Honor.  Simply

15   the government act of discrimination and

16   classification constitutes an injury.

17           THE COURT:  Injuries other than that?

18           MR. AZMY:  Before the publication?

19           THE COURT:  Right.

20           MR. AZMY:  No, but we also assert that

21   after the publication government officials, these

22   are in allegations around paragraph 60 of our

23   complaint, city officials sort of doubled down on

24   the justification for this program and said that

1    this kind of suspicionless surveillance was

2    necessary.  So that sort of reups the causation.

3              And the city has not pointed -- where

4    it's certainly redressable by an injunction against

5    this program, and it's hard to imagine how you

6    could have redressability without also having

7    causation.  I mean we couldn't sue the AP and get

8    redress, it's only the NYPD that causes the injury.

9              And of course, and so we have

10   institutional --

11             THE COURT:  Actually you wouldn't want

12   to sue the AP.

13             MR. AZMY:  No, we wouldn't, no.  No.

14   We might lose that battle.

15             THE COURT:  Well, you don't want to

16   discourage them.

17             Yes, that's my point.

18             MR. AZMY:  Yes.  Yes.  Precisely.  And

19   contrary to the district court's -- essentially we

20   think the AP was playing a central role in our

21   democracy.  And once they exposed government

22   wrongdoing it seems to us that the court's role is

23   to address that wrongdoing.

24             THE COURT:  Your time is running, but

1    what's your best case?  I've looked at some other

2    circuits but no Supreme Court cases that squarely

3    support you?

4                    MR. AZMY:  Yes.  On the question of --

5                    THE COURT:  You mentioned Presbyterian

6    Church.

7                    MR. AZMY:  Yes.  That goes to --

8                    THE COURT:  On the showing of injury?

9                    MR. AZMY:  On the showing of injury.

10   That goes to congregants' injury.  The Council for

11   Imams in New Jersey, two mosques that were actually

12   surveilled, and changing in religious profiling,

13   that's Presbyterian Church.  For the fact that a

14   mere classification constitutes injury I would say

15   Hall, Anderson and all of the affirmative action

16   and racial gerrymandering cases which identify

17   classification as a harm independent of

18   consequences.

19                    For the change in religious behavior

20   in response to -- the change in religious practice

21   in response to government, the free exercise claim,

22   these cases are legion.  To begin with Friends of

23   the Earth --

24                    THE COURT:  But isn't that really

1    Laird?  Isn't that speculative?

2              MR. AZMY:  It's not speculative, your

3    Honor.  When there is a present change of behavior

4    that is reasonably, objectively reasonable I would

5    commend to you Judge Breyer's opinion in Ozonoff,

6    then Judge Breyer's opinion.

7              But even Friends of the Earth v.

8    Laidlaw says when you change behavior in response

9    to government illegality, that's actually

10   happening.  I mean we allege his mosque was being

11   surveilled, and to not go to that mosque is an

12   entirely, we believe, objectively reasonable

13   response to government misconduct.

14             And then we also have economic

15   injuries as well, which are I think garden variety

16   and recognizable.

17             THE COURT:  If there's a legitimate

18   concern that the City of New York has with regard

19   to particular persons that might be subject to

20   investigation for terroristic acts, or possible

21   terroristic acts, how do you narrowly tailor what

22   they need to do to try to ferret that out?

23             MR. AZMY:  Well, to begin with, I

24   think they have to be able to articulate, at a

1    minimum, reasonable suspicion that someone is

2    involved in that behavior.  They have not

3    articulated that here.  Of course we're on a motion

4    to dismiss.  They wouldn't, but --

5            THE COURT:  Well, they say the events

6    of 9/11 is what triggered the need for this kind of

7    surveillance.

8            And don't you want to be able to

9    determine who is a terrorist before you have

10   reasonable suspicion of a particular individual?

11           MR. AZMY:  Your Honor, you know, the

12   -- you might, but there are ample law enforcement,

13   traditional law enforcement mechanisms that the

14   NYPD in all its sophistication, other police

15   departments can use.  You could not do that any

16   more than what the NYPD I think got in trouble for

17   with respect to stop and frisk, which is using race

18   as a proxy for criminality.  You cannot use

19   religion as a proxy for criminality.

20           We're talking about decent, patriotic

21   Americans who were subject to this surveillance

22   based on no suspicion whatsoever.

23           THE COURT:  You mentioned traditional

24   police methods that could have been used instead of

1   the ones that they did?

2           MR. AZMY:  Yes.  Following leads,

3   which I'm sure they do.  This is a blunderbuss,

4   suspicionless surveillance program based -- where

5   the only search criteria is religion.  And I can't

6   emphasize enough that the Supreme Court has said we

7   can't dismiss, you cannot accept the city's

8   explanation that they're using race in a

9   permissible way.

10          Of course, for example, in Johnson vs.

11  California, that's the prison segregation case, the

12  Department of Corrections in California surely said

13  we are not discriminating when we segregate blacks

14  and whites.  We're merely trying to solve a very

15  important problem with gang violence.

16          The court said you still have to apply

17  strict scrutiny and make sure it's narrowly

18  tailored.

19          THE COURT:  You didn't mention, since

20  we're in Philadelphia, Philadelphia Yearly, which

21  is --

22          MR. AZMY:  Philadelphia Yearly is a

23  case as well --

24          THE COURT:  That's an injury in fact

1    because we are talking about the district court's

2    holding involving no injury on your part.

3               MR. AZMY:  Precisely, your Honor.

4    Philadelphia Yearly says that dissemination,

5    publicly available information about individuals

6    who were subject to surveillance would subject them

7    to future harm.

8               In our case we have a number of MSA

9    students who are worried about future employment

10   harm, and our lead plaintiff, Mr. Hassan, who is a

11   decorated war veteran, who will have a security

12   clearance, he may have a security clearance problem

13   as a result of this.  And Philadelphia Yearly

14   supports standing on those grounds.

15              THE COURT:  Thank you very much.

16              MR. AZMY:  Thank you, your Honor.

17              THE COURT:  We'll hear from

18   Mr. Farrell.

19              MR. FARRELL:  May it please the Court,

20   my name is Peter Farrell and I represent defendant,

21   City of New York.

22              THE COURT:  Let me ask you, in

23   connection with the standard to apply here, what is

24   the standard?  Is it strict scrutiny, intermediate

1    scrutiny?  What?

2              MR. FARRELL:  Your Honor, we do not

3    get to the standard in this case.  Plaintiffs are

4    required, in their pleadings, to plead an actual

5    injury and causation.

6              THE COURT:  We'll get to that.

7    Assuming that they have pled it, and you'll

8    obviously have a chance to argue that, what is the

9    standard that you suggest that we apply?

10             MR. FARRELL:  Your Honor, in terms of

11   this case I'm focused on the pleading.  If you got

12   to the merits on this I think that there are

13   arguments to say that there should be rational

14   basis because --

15             THE COURT:  They're claiming it's

16   based on religion, which normally gets strict

17   scrutiny, which means you'd have to have something,

18   something that's narrowly tailored to achieve a

19   compelling state interest, whereas intermediate

20   scrutiny would be an important -- must further an

21   important government interest by means of something

22   that's substantially related to that interest.

23             MR. FARRELL:  The reason that is, your

24   Honor, because it's a lesser standard.  There's no

1   policy, there's no written policy in this case --

2              THE COURT:  But is there a custom or

3   practice?

4              MR. FARRELL:  No, your Honor, there's

5   not a custom or practice.

6              THE COURT:  So why do they do it?

7   Somebody tells them to go in and do the

8   investigation, the types of surveillance that we're

9   talking about.  In fact, just this past weekend you

10  had the former mayor of New York suggesting that he

11  was upset that the, quote, policy, close quote, has

12  been discontinued.  So I mean he's calling it a

13  policy.  That's not in the record so it doesn't,

14  doesn't necessarily help you.

15             Well, we don't know exactly what the

16  policy is, just that it was discontinued.

17             THE COURT:  He talked about a policy

18  of surveillance.

19             MR. FARRELL:  There is no written

20  policy.  This case at its heart involves

21  surveillance of public spaces and public activity.

22  Laird speaks to this on point.  Laird involved

23  allegations that go well beyond that were

24  characterized by plaintiffs' counsel.

1          Laird involved allegations of chilling

2     of First Amendment activity, it involved the use of

3     undercovers, it involved attendance at public

4     meetings, it involved attendance at church

5     meetings, it involved preparation of field reports

6     based upon the observations at those meetings.

7          THE COURT:  The district court relied

8     very heavily on the case that you are now referring

9     to.  But Laird involved a challenge to a program, a

10    program without showing of any injury.

11         But in this case the plaintiffs are

12    indeed enumerating a series of injuries that they

13    have sustained as a result of the program, the

14    custom or the policy.  Let me leave the word

15    policy.

16         MR. FARRELL:  The injuries, the

17    injuries in Laird were more than that that were

18    alleged.  The injuries in Laird that were alleged

19    were damage to reputation.

20         THE COURT:  But there was no showing

21    of injury.  It was just the program itself that was

22    being challenged.  But this is very different.

23    This case is very different.

24         MR. FARRELL:  Well, I don't see it as

1    being different, your Honor.  I see it as being on

2    exactly the same facts because -- sorry.

3            THE COURT:  Let me put the question

4    this way.  Were any injuries shown by the

5    plaintiffs in Laird?

6            MR. FARRELL:  It was a pleading stage,

7    your Honor.  They accepted the allegations --

8            THE COURT:  As this is.

9            MR. FARRELL:  Yes, they accepted the

10   allegations in the pleading, they would have to.

11   The pleading contained allegations, which was

12   supplemented by affidavits in front of the court,

13   that claimed damage to reputation, an adverse

14   effect on their employment, that the actions by the

15   Department of Army in conducting surveillance and

16   sending reports out throughout the country to the

17   department Army bases, was based on harassment and

18   intimidation.  And it also alleged that a black

19   list was created of the people that were

20   surveilled.  So the allegations --

21           THE COURT:  You had things that were

22   compiled that, like locations of concern, and that

23   if you knew, based on this AP story, what was a

24   location of concern, let's say it was a mosque or a

1    particular store, you might not frequent that

2    store.  And for example a mosque said that fewer

3    people are attending services.

4              And isn't that an injury?

5              THE COURT:  Isn't that an injury?

6              MR. FARRELL:  No, your Honor.  The

7    basic --

8              THE COURT:  How so?

9              MR. FARRELL:  The basic tenet of

10   standing requires a government policy that

11   regulates, prohibits or compels.  That is a basic

12   tenet of standing across all standing cases.

13             Surveillance of public activity does

14   not prohibit, compel anyone to do anything.  If you

15   extrapolated that -- all right, this is not a case

16   that involves a stop, it's not a case that involves

17   a search, it's not a case that involves a

18   detention, it's not a case that involves an arrest,

19   it's not a case that involves a prosecution.

20             THE COURT:  Did this city or New York

21   Police Department policy target any group other

22   than Muslims?

23             MR. FARRELL:  I'm looking at the

24   allegations in the complaint, your Honor.

```
1              THE COURT:  I'm considering the

2    complaint itself.  And the question is that -- or

3    the point is that New York City Police Department

4    was targeting a religious group, Muslims.  And

5    you're referring to something else.  And I just

6    want to know what the New York Police Department

7    was targeting in its surveillance program.

8              MR. FARRELL:  There is no policy

9    targeting Muslims, your Honor.

10             THE COURT:  No, I wasn't asking --

11             MR. FARRELL:  They seek to draw an

12   inference based upon --

13             THE COURT:  What was the purpose of

14   the program?

15             MR. FARRELL:  The allegations in the

16   complaint -- if you want to talk about

17   plausibility, they're seeking to draw an inference

18   that the purpose of the program was to discriminate

19   on the basis of religion, and in order to do that

20   --

21             THE COURT:  From the perspective of

22   the New York City Police Department, what was the

23   purpose of this surveillance program?

24             MR. FARRELL:  It provides useful
```

1    intelligence gathering so that in the event of, for

2    example, they receive information about a terrorist

3    threat, and say the terrorist is, they get

4    information that the terrorist is Syrian, and is

5    somewhere in the tri-state area, and they need to

6    respond to try and find out where that person would

7    be concealing himself, or where that person may try

8    to go to a place where he could recruit others to

9    help.

10          The city and the police department

11   would need to know the geographical concentrations

12   of people of Syrian ethnicity.  They would need to

13   know where those pockets of geographical

14   concentrations are because the likelihood would be

15   that somebody would try and conceal themselves

16   among other people so that he would not stand out.

17          So if they --

18          THE COURT:  But the target was

19   restricted to a religious group, wasn't it?  I mean

20   it was restricted to Muslims.

21          MR. FARRELL:  No.  The complaint says,

22   it alleges that the police department's, what they

23   call the program, was directed at ancestries of

24   interest and identifying ethnicities.  It says that

1    in the complaint.  And their own allegations make

2    this point, or show how it's a legitimate law

3    enforcement purpose.

4              They claim that the police department,

5    City of New York Police Department's going out,

6    after the publication of the Danish cartoon in

7    2006, which caused a worldwide reaction, a strong

8    reaction among the Muslim community, which included

9    at other parts of the world violence and even

10   death, and they allege that as an indication of

11   support that the purpose of the program is to

12   discriminate against Muslims.  That's just --

13             THE COURT:  That may not be true.  We

14   don't know.  But isn't at this point of the

15   proceedings, isn't a rule that we have to accept

16   the pleadings as true?

17             MR. FARRELL:  Iqbal speaks to this.

18   You do not have to accept the conclusory

19   allegations in the complaint.

20             THE COURT:  It's not conclusory when

21   someone says that there is lesser attendance at a

22   mosque.  It's not conclusory when they said there's

23   fewer monies coming in.  It's not conclusory when

24   it says my store has less money coming in and

1    there's economic injury.  That's plausible.

2              MR. FARRELL:  The plausibility is not

3    directed at the injury.  The plausibility, your

4    Honor, is directed at whether, and this is the test

5    stated by the Supreme Court in Iqbal, whether, to

6    be plausible the city acted because of the adverse

7    effect upon Muslims.

8              That is the key.  That is the key to

9    the entire plausibility case, that the city's

10   actions, in order to plead a case for purposeful

11   discrimination, which is what this is, has to be

12   that the city took its actions of the public

13   surveillance alleged because of the adverse effects

14   it would impose upon Muslims.

15             THE COURT:  Okay.  But our questions

16   right now are directed to the issue of injury, and

17   the injury to the mosques by a decrease in

18   attendance, the injury to the commercial locations

19   by a decrease in customers.

20             And don't we have to accept that as

21   true in the complaint?  Don't we have to then

22   permit, having taken the first step, permit the

23   plaintiffs to take the second step?

24             And maybe they can't show that this is

1    a policy directed at Muslims just to -- because of

2    prejudice against Muslims.  Maybe they can show,

3    the defendants can show other reasons.

4              But based upon the complaint itself,

5    accepting the complaint as true, at least for some

6    of the defendants, don't we have to accept that

7    they have passed the Iqbal standard and presented a

8    plausible theory of relief?

9              MR. FARRELL:  Your Honor, you can

10   accept the allegations of injury as true.  But

11   under Laird those injuries that they allege are not

12   concrete and particularized.

13             THE COURT:  Well, loss of attendees at

14   a mosque is a concrete injury, isn't it?

15             MR. FARRELL:  No, not in this case,

16   your Honor, as pled, because the public

17   surveillance does not constrain or compel or

18   prohibit attendance at a public mosque.  All the

19   injuries that they allege are self-imposed injuries

20   based upon subjective fears.

21             The police department is not

22   prohibiting anyone from attending a mosque, it has

23   taken no steps to inhibit anyone's employment.

24   They are self-imposed fears.  There's no

1    prohibition.

2              THE COURT:  If you're a Muslim and you

3    go to mosque religiously and you knew that the New

4    York City Police Department was surveilling that

5    mosque, you know I would think -- I don't think I'd

6    want to go there any more.  Maybe I would pick

7    another mosque.

8              So it's the result of the practice

9    that causes an injury, isn't it?  And if I knew

10   that you were looking at my business and

11   photographing my business and if the customers of

12   that business knew that it was subject to

13   surveillance, they would not want to go into that

14   business any more.  Aren't those concrete losses?

15   Aren't those concrete injuries pled by the

16   plaintiffs?

17             MR. FARRELL:  Those injuries are based

18   upon subjective fears.  If there was a police

19   officer standing in front of a store --

20             THE COURT:  It's not a subjective fear

21   to know that the mosque that I want to go to is

22   under surveillance.

23             And that I don't go there because of

24   that.  That's objective.  You may have a subjective

1    view that maybe I shouldn't go there, but the

2    bottom line is that the mosque itself objectively

3    has fewer attendees, objectively has less money

4    coming in, commercial outlets have objectively less

5    money coming in.

6         MR. FARRELL:  A few things, your

7    Honor.  That's not all the plaintiffs, none of the

8    individual plaintiffs allege those injuries.

9         THE COURT:  It's not all the

10   plaintiffs, but there are plaintiffs who, taking as

11   true the allegations of the complaint, have

12   suffered injury.

13        MR. FARRELL:  I would point the court

14   to Clapper v. Amnesty International.  There the

15   court said that -- and I think it was in footnote

16   seven, that someone imposing, even though they may

17   have fears, those are self-imposed fears.  There

18   may be other people who don't share those fears.

19   There may be people who would go to mosques and

20   frequent stores and would be appreciative of having

21   --

22        THE COURT:  We asked Mr. Azmy what

23   would be some of the, what would narrow tailoring

24   be if we applied the test that he wants, which is

1   strict scrutiny.  And he said, for example,

2   reasonable suspicion, following leads.

3           So if you have reasonable suspicion

4   that Mr. X could be a problem with regard to

5   terrorism, well understood.  The concern that they

6   have, the plaintiffs here, is that if you don't

7   have reasonable suspicion, that all of the others

8   besides Mr. X are not under any kind of suspicion

9   and you go out and you investigate and surveil them

10  on a continuing basis, they believe that you're

11  doing so as a result of their religion, and nothing

12  else.

13          There is no reasonable suspicion,

14  there is no following of a lead.  And they're

15  saying that survives 12(b)(6) motion to dismiss.

16          MR. FARRELL:  Your Honor, it does not

17  survive it.  There's no allegation in this

18  complaint.  I mean they're using the term

19  surveillance --

20          THE COURT:  But isn't that really the

21  crux of what we're here for?

22          MR. FARRELL:  I don't see that, your

23  Honor.  I see it as that they're claiming that the

24  police department cannot conduct observations in

```
 1    public.  They use the term surveillance.  Nobody in

 2    this case has claimed that they're being followed.

 3    The six plaintiffs don't even allege that they

 4    personally were surveilled.

 5               THE COURT:  You don't have to follow

 6    people any more.  You've got cameras on all the

 7    light posts.

 8               MR. FARRELL:  Photography and

 9    videotaping, those were addressed in Philadelphia

10    Yearly.  The Philadelphia Police Department went

11    out and took photographs and did videotaping.  The

12    courts said those actions, public surveillance, do

13    not create a concrete injury.

14               I would also --

15               THE COURT:  For example, let's go back

16    to another religion, another day, another time.

17    You have abortion clinics and you have persons who

18    are adamantly opposed to abortion and they're

19    willing to take actions.  Those persons primarily,

20    or were often Catholics and Baptists.

21               What was done, it wasn't that

22    Catholics and Baptists per se were followed.  You

23    had people like Randall Terry and others who were

24    involved with the abortion clinics and were
```

```
 1   suspected of violence, and you looked at those

 2   persons and those around them who interacted with

 3   them.  They were following a reasonable lead.

 4              Here the argument is significantly

 5   more than that.  You're not just following those

 6   who are persons of interest, you're following

 7   everyone who is of a particular religion to see if

 8   somehow they might be interacting at some point in

 9   time with places where the persons of interest

10   might go.  And it's qualitatively different, is

11   what they're arguing here.

12              They're arguing that there's a custom,

13   a program that you call it, of surveilling these

14   persons just because they are of a particular

15   religion.  Isn't that much different than the case

16   that deals with abortion?

17              MR. FARRELL:  Your Honor, the

18   allegation that we're doing it based solely upon

19   religion is a conclusory allegation that under

20   Iqbal is entitled to no weight.  You need to look

21   at the --

22              THE COURT:  What's conclusory about

23   it?  You tell me.

24              MR. FARRELL:  Because it's a
```

1   conclusion that says the actions, which are facts,

2   are done because of, solely on the basis of

3   religion.  Iqbal, in the complaint, if you compare

4   the Iqbal complaint and the court, the court's

5   opinion, it goes through and it says which are the

6   conclusory paragraphs in Iqbal's complaint.

7            Iqbal pled, Iqbal involved an arrest

8   of the plaintiff, a detention in a maximum security

9   where he could not talk to anyone on the outside.

10  His pleading in Iqbal stated those actions, of

11  holding him in the maximum security, was based

12  solely upon his religion.

13           The court in Iqbal said based solely

14  upon his religion is a conclusory allegation that

15  is not entitled to weight at the pleading stage.

16  The court then went on to look at the facts to

17  determine whether his arrest and subsequent

18  detention in high security was plausible that it

19  was based on the fact that he was solely -- solely

20  based on his religion.

21           THE COURT:  May I give you a statement

22  from the Ninth Circuit.  This is a case that was

23  decided over 25 years ago in the Ninth Circuit.

24  Churches, as organizations, suffer cognizable

1    injury under the First Amendment when assertedly

2    illegal government conduct deters their adherents

3    from freely participating in religious activities.

4    That was a surveillance program just like this one.

5            Why doesn't that court's ruling inform

6    us as to which way we should proceed with the

7    injuries here?

8            MR. FARRELL:  Is that Presbyterian

9    Church, your Honor?

10            THE COURT:  Presbyterian Church.

11            MR. FARRELL:  A, that's not

12    controlling, that's a Ninth Circuit case.  Two,

13    that case misapplied Laird.  That case, the crux of

14    that case holding said that the plaintiffs in Laird

15    were not the subject of surveillance and made the

16    distinction that those plaintiffs in Laird, because

17    they were not the subject of surveillance, that the

18    Supreme Court's rationale behind Laird did not

19    apply to the case before it where they were

20    actually subjects of surveillance.

21            We've proven that, we've shown in our

22    papers, your Honor, it's without a doubt that the

23    subjects in, the plaintiffs in Laird were the

24    subjects of the surveillance.  And the court,

1    despite that, despite the alleged injuries, held

2    that those are insufficient and not concrete

3    injuries to provide standing.

4                    Your Honor, I see my time is up.

5                    THE COURT:  That's okay.  You're on

6    our time.

7                    Mr. Azmy stated in response to one of

8    my questions that the policy of the New York City

9    Police Department did not have to be demonstrated

10   in the complaint, that it could wait further

11   proceedings and further development and further

12   discovery.

13                   Now, do you take the opposite position

14   and what case do you base your position on?

15                   MR. FARRELL:  Your Honor, you don't

16   need to go past the pleading stage based upon a

17   conclusory allegation that the policy that they, or

18   the practice they complain of is based solely upon

19   religion.  You just don't get to engage in

20   discovery to try and unearth a policy.  You have to

21   look at the facts of this case and look to see

22   whether there's concrete injuries.

23                   THE COURT:  It sounds like you have to

24   try the case in the complaint, which seems totally

1    wrong.

2            It sounds like to me you're at summary

3    judgment stage here.

4            MR. FARRELL:  No, your Honor, I'm

5    looking solely at the pleadings.

6            THE COURT:  Well, the pleadings do

7    demonstrate a focus on Muslims and no one else.

8    And with the reports that the AP publicized, I

9    think that strengthens the supposition that the

10    policy is directed at Muslims.  And it's your

11    position that that is not sufficient to pass the

12    12(b)(6) stage because, what, because there are

13    other reasons it could be done, or what?

14            MR. FARRELL:  Your Honor, the

15    assumption in your question is that they have pled

16    concrete injuries.  The injuries they have pled are

17    not concrete, they're not recognized by the Supreme

18    Court as --

19            THE COURT:  Well, what about the

20    mosques?  They've pled that there's a decrease in

21    attendance since it has been determined that the

22    attendance is down in the mosques because of the

23    surveillance.

24            They claim (inaudible) location of

1    interest.

2              THE COURT:  Yes.

3              -- of concern.

4              MR. FARRELL:  And that is a

5    subjective, self-imposed --

6              THE COURT:  That's not subjective.

7    That is an objective loss of attendance, an

8    objective loss of income to the mosque.

9              MR. FARRELL:  The persons who are not

10   attending the mosque are subjectively doing so.

11   They're not being compelled or prohibited by the

12   police department.

13             THE COURT:  Okay.  But it's not their

14   state of mind, it's what has happened to the mosque

15   that is one of the injuries pled in the complaint.

16             MR. FARRELL:  Your Honor, I would say

17   that the decision in Clapper v. Amnesty

18   International recognizes that some third party who

19   doesn't act because of subjective fears does not

20   create a concrete injury on behalf of the

21   plaintiff.

22             THE COURT:  How about the merchant in

23   a store who loses customers, who loses money,

24   dollars, that's very concrete and the customers are

1    not going there because they have this fear that

2    they're going to be photographed and that the

3    customers of the store are being surveilled.  Isn't

4    that a concrete injury?

5                 MR. FARRELL:  No, your Honor.

6                 THE COURT:  When you lose money, to me

7    that's concrete.

8                 MR. FARRELL:  Again, it's the third

9    party, because of self-imposed fears, are not going

10   to attend a particular store.  If you just

11   extrapolate what you're saying, then any business

12   anywhere, in New York City, for example, there are

13   police outside of it walking by, standing there.

14                 If somebody comes down the street and

15   that particular business owner says, you know, I

16   really don't like the fact that there's a police

17   officer stands outside my business, or I don't like

18   the fact that there's a police car that drives down

19   my street, I think I'm losing customers, right?

20   That person, if you extrapolate, that business

21   owner would have standing.

22                 THE COURT:  No, he wouldn't.

23                 MR. FARRELL:  All he would have to do

24   then is say that the only reason that that police

1    officer stands in front of my business or drives

2    down my street, and then you can insert, you can

3    insert an ethnicity, you can insert a race, you can

4    insert a religion.

5              THE COURT:  All right.  Then --

6              MR. FARRELL:  You could also

7    extrapolate --

8              THE COURT:  You would have to support

9    that by similar situations with persons of the same

10   ethnicity, race or religion.  I mean here you have,

11   you have the plaintiffs have asserted not just one

12   person saying there's a policeman outside my store,

13   there are a number of plaintiffs saying that there

14   is a policeman outside my store and there's a

15   report which indicates that these policeman are

16   deliberately outside my store because of my

17   ethnicity, race or religion.

18             So it's not just outside the store.

19   You've got an AP report that's saying to those

20   folks, hey, this isn't just something you're just

21   thinking about, they're there for a purpose, or as

22   you call it, a program.

23             MR. FARRELL:  And that goes to

24   causation, your Honor.  This program, as alleged,

1    went from 2002 through 2012.  For ten years

2    plaintiffs, by their own allegations, did not

3    suffer an injury.  Their allegations, every single

4    one of them says the injury occurred after the

5    Associated Press wrote their articles and released

6    documents, where the Associated Press released

7    those documents without redacting identifying --

8              THE COURT:  Because before a lot of

9    people didn't know about the program.  But now, as

10   a result of what the press put out here they now do

11   know of the program.

12             Let me go back to, what is the

13   difference to you between program, a custom, a

14   practice or a policy?

15             MR. FARRELL:  A written policy on its

16   face, if it said we are going to go surveil the

17   Muslim community based solely upon religion --

18             THE COURT:  Policies can be oral,

19   can't they?

20             MR. FARRELL:  Yes, they can.  I was

21   just trying to explain what the difference, what in

22   my opinion the difference was.  It can be oral, or

23   stated, written or stated, said we're going to

24   surveil the Muslim community based solely upon

1    religion, right, whether it's oral or in writing.

2    That on its face would be a discriminatory

3    classification.

4              Here there is no such --

5              THE COURT:  What's the difference

6    between a program then and a practice?

7              MR. FARRELL:  Because a practice

8    requires, your Honor, that the inference of

9    discriminatory purpose be drawn from the acts

10   alleged.  You don't have a statement by the city

11   saying we're doing it because it's based solely

12   upon religion.

13             When it's a practice, which is what

14   they allege, where it's acts, they're trying to

15   assign a discriminatory purpose to those acts.

16   That's a conclusory allegation.

17             So the question is is it plausible

18   that the acts they're complaining about, that the

19   police department goes out and conducts

20   surveillance and gathers intelligence so it would

21   know where to respond to a potential terrorist

22   trying to hide, whether that act is solely because

23   of the adverse effect it's going to have upon the

24   Muslim religion.

 1              And our position, and I think it is

 2    soundly supported in Iqbal, is that that is not a

 3    plausible claim in this case when you juxtapose

 4    their allegations that the program was instituted

 5    immediately after 9/11 and in response to 9/11,

 6    that was an act that was carried out by 19 Arab

 7    Muslims -- and these are the facts that are relied

 8    upon in Iqbal -- 19 Arab Muslims who were led by

 9    Osama bin Laden, who was an Arab Muslim, and the

10    disciples of al Qaeda who are all Arab Muslims.

11              Those are the facts that the Supreme

12    Court relied upon to say that the discriminatory

13    inference that the plaintiff Iqbal was trying to

14    draw based upon his arrest and his subsequent

15    segregation and detention was based solely on his

16    religion.  The court said no, that's not --

17              THE COURT:  Refresh our recollection

18    then.  What was the program here that was in

19    existence since 2002?

20              MR. FARRELL:  By plaintiffs'

21    allegations, the program that's in existence is all

22    the things that they allege, that there was public

23    surveillance of businesses, of restaurants, of

24    mosques, of all the various types of things you

1   would find in a community.

2           THE COURT:  And how does that not

3   survive a motion to dismiss?

4           MR. FARRELL:  Because to assign the

5   label that that is being done solely based upon

6   religion, it has to be plausible.  You apply common

7   sense and your judicial experience is what Iqbal

8   counsels.  You would have to step back and say --

9           THE COURT:  It's amazing how broad our

10  thought of what is plausible has become during our

11  tenure as judges.

12          MR. FARRELL:  You would have to say

13  that it's plausible that New York City Police

14  Department, right after 9/11, right after the

15  threat that it faced, the additional continuing

16  threat posed by Islamists who are radicalized to

17  violence, that the actions that they allege, to go

18  out and conduct public surveillance, was solely

19  because of religion.  That is not the case.

20          The primary purpose, if Islamists'

21  radicalized to violence had not carried out the

22  terrorist attack, if it wasn't the illegal and

23  unlawful activity, the police department would not

24  be looking at, and trying to figure out where

1    ethnicities are geographically located and looking

2    at Muslim businesses and mosques.  That is the key.

3              THE COURT:  It sounds like you're

4    justifying the surveillance program.

5              MR. FARRELL:  I'm sorry?

6              THE COURT:  It sounds like you're

7    justifying the surveillance program.

8              At the summary judgment stage.

9              MR. FARRELL:  Your Honor, I'm not

10   doing a good, because what Iqbal counsels --

11             THE COURT:  But may I say that in

12   fact, having looked at the district court opinion,

13   that it seems like the district court opinion

14   relied on the city's justification for the program.

15   Whether good or not, it seemed to rely on the

16   justification.

17             MR. FARRELL:  And this is a critical

18   point, your Honor.  I'm glad you raised it, because

19   I would be remiss if I didn't address it.

20             The plausibility standard, as

21   articulated by the Supreme Court, says when a court

22   looks to determine if something is plausible,

23   right, it also looks at whether there's a more

24   likely explanation.  Those are the words that come

```
 1    out of Iqbal, is there a more likely explanation.
 2               You're not picking between two
 3    plausible theories.  You're looking at whether the
 4    allegations, the discriminatory inference that the
 5    allegations look to draw, whether that's plausible.
 6               THE COURT:  That's right.
 7               MR. FARRELL:  And Iqbal says you get
 8    to look at the more likely explanation.
 9               THE COURT:  But you're restricted to
10    the explanation as it emerges from the pleading
11    itself.
12               MR. FARRELL:  Absolutely.  And the
13    pleading here, your Honor, explicitly articulates
14    that the program started immediately after 9/11.
15               THE COURT:  When you look at what
16    plausibility is under Iqbal and Twombly from 10,000
17    feet, what it really means is when somebody makes
18    an allegation in a complaint, could it be true?  It
19    isn't the old test, well, it might be conceivable,
20    but is it true?  Is there something backing it up?
21               Here the allegation is that they're
22    being surveilled based on religion and the things
23    that back it up are the things that we've talked
24    about with regard to whether there is injury in
```

1    fact, decreased attendance, fewer sales at

2    commercial outlets, et cetera.

3                How is that not plausible?  How is

4    that not something that's alleged with some facts

5    in the background to support it?

6                MR. FARRELL:  Your Honor, that is

7    discriminatory impact.  Iqbal addresses this head

8    on.  It says there may be a discriminatory impact,

9    but if discriminatory impact is what you are

10   looking at, you're looking at the injuries that may

11   be, you allege are being caused, is not evidence of

12   discriminatory purpose.

13               Purpose requires the plausibility of

14   the purpose.  And it said, the Supreme Court said

15   in Iqbal, yes, the actions --

16               THE COURT:  Wait a minute.  You've

17   lost me. Plausibility of the -- what do you mean by

18   that?  Plausibility of the purpose, what does that

19   mean?

20               MR. FARRELL:  What I'm saying, your

21   Honor, is, this court needs to determine whether

22   the inference, right, of a discriminatory purpose

23   is plausible based upon the facts alleged.  Because

24   there is no explicit policy saying that we're going

1    to do it solely on the basis of religion.  There is

2    no oral or written policy.

3                They are relying upon external factors

4    to say, well, look at this, and from these factors

5    you can infer a discriminatory purpose.  That

6    inference that they want this court to infer has to

7    be plausible.  And you get to look at a more likely

8    explanation for the conduct that they are trying to

9    rely upon.

10               THE COURT:  And how can I sit here and

11   say based on those allegations that it's not

12   plausible?  Remember we're, 12(b)(6), how can I say

13   that that's not plausible?

14               You've got to admit that there are a

15   number of people in this country who are very

16   prejudiced against Muslims because of 9/11.  And

17   whether those individuals are the ones, include the

18   ones who have instituted the surveillance policy or

19   practice in New York City, how can we know at this

20   point?

21               Maybe with some discovery we can see

22   that, yes, this was truly a police investigatory --

23   it was the police trying to ferret out terrorism

24   before it developed, or it was members of the

```
1    police department who were unfortunately prejudiced

2    against Muslims.  And don't we need to permit

3    further discovery in order to make that

4    determination of which reason for the practice is

5    the most logical, rational?

6              MR. FARRELL:  No, your Honor, you do

7    not need to permit more discovery.  It may have

8    even been in Clapper v. Amnesty International where

9    they addressed that.  You don't get to go and

10   conduct discovery to try and support your standing

11   or your claim.

12             And your Honor, let's go back to your

13   point of conceivable.  The Supreme Court

14   specifically said, while Iqbal's claims may be

15   conceivable that he was detained in high security,

16   that may be conceivable, that does not mean that

17   they are plausible.  So there's a distinction that

18   the Supreme Court has put on between conceivable

19   and plausible.

20             And here I would urge the court to go

21   back, look at the complaint, the allegations, and

22   that it is set up as a response, post-9/11 in

23   response to the terrorist attacks against New York

24   City.  And it's not plausible, the inference
```

1    they're asking you to draw, that surveillance after

2    that event was based, was because of the city's

3    wanting to have an adverse impact on the Muslim

4    community.

5            THE COURT:  I think the difference is

6    that prior to the AP report someone might perceive

7    that he, she or that person's places where they

8    frequent are under surveillance as a result of

9    religion.  That's conceivable in '03, '04, '05.

10            But after the report it now has

11    support and it becomes plausible, does it not?

12            MR. FARRELL:  The AP's report assign,

13    right, an impermissible purpose to the

14    surveillance.  It's not a police department policy

15    or statement they relied upon.  They assign a

16    discriminatory purpose.  And I would urge the court

17    not to look at injury --

18            THE COURT:  No, what they're saying is

19    that the surveillance was done primarily as a

20    result of being Muslim, and that the test for that

21    is strict scrutiny, and that ultimately you have to

22    bear the burden of showing that this compelling

23    state interest that you have to stop terrorism, no

24    one disagrees with that, that it's narrowly

1    tailored to that compelling state interest.  And

2    that seems to be something that has to be done down

3    the road, not today.

4              MR. FARRELL:  Your Honor, I would ask

5    the court then to go back and look at Iqbal.  There

6    the claim was the acts were taken solely because of

7    religion.  The court decided plausibility.  It did

8    not go into an analysis of whether strict scrutiny

9    applies or some other standard or whether it's

10   narrowly tailored.

11             If I'm hearing the court correctly,

12   then whenever you have an allegation of being

13   solely based upon religion, the plausibility

14   standard would never apply.

15             THE COURT:  Back to my example.  It's

16   taking what was conceivable at one time and adding

17   the something more, the fact that there is,

18   according to this report, a program or a policy,

19   whatever you want to call it, that does single out

20   people, because of their religion, for

21   surveillance.

22             MR. FARRELL:  That's a reporter's

23   opinion, your Honor.  It's not based upon a policy

24   or a statement.  And if anything, that shows that

1    the injury --

2              THE COURT:  But at this point does it

3    not deserve a further look?

4              MR. FARRELL:  Your Honor, I think -- I

5    have reviewed --

6              THE COURT:  We know you're going to

7    say no, so.

8              MR. FARRELL:  I have reviewed Laird, I

9    have looked at the transcript of the oral argument

10   is available online, I was able to find it on

11   oyez.org.  You go through it, the allegations are

12   almost exactly the same as the case here, and this

13   shows it was not a concrete injury.

14              And Iqbal, it would have to have gone

15   through and said we can't decide this now because

16   there's an allegation of a discriminatory purpose

17   from which you want us to draw an inference from

18   being held in high security, and they would say we

19   can never decide that.  That's not the rule.  You

20   get to decide plausibility --

21              THE COURT:  We're now going round and

22   around.

23              MR. FARRELL:  Okay.

24              THE COURT:  Any further questions?

1              No.

2              THE COURT:  No.

3              MR. FARRELL:  No, your Honor, I think

4    that's everything I have.

5              THE COURT:  Okay.  Thank you very

6    much.

7              MR. FARRELL:  Thank you.

8              THE COURT:  Mr. Azmy.

9              MR. AZMY:  Thank you, your Honor.  A

10   few brief points.  At this stage we do not need to

11   show that the sole reason or sole justification for

12   the discrimination is religion.  We just need to

13   show the sole criteria or a criteria is religion,

14   that states a claim for facial classification,

15   triggers strict scrutiny and survives Iqbal.

16              It survives Iqbal because we have

17   ample nonconclusory allegations demonstrating a

18   classification throughout the complaint.  I'll

19   focus on just two examples, paragraphs 40 to 42

20   deals with the ancestries of interest mentioned by

21   counsel.  There they identify 28 ancestries of

22   interest who represent 80 percent of the world's

23   population.  But it goes further, it focuses laser

24   like on religion so that they surveil Egyptian

1    Muslims but not Egyptian Copts, Syrian Jews but

2    not Syrian Muslims.  They surveil immigrant

3    communities --

4              THE COURT:  I think you got that one

5    mixed up.

6              MR. AZMY:  Sorry.  Excuse me.  Thank

7    you, your Honor.  That wouldn't have been very

8    helpful.

9              THE COURT:  It just shows we're

10   listening.

11             MR. AZMY:  I wish I could say that was

12   a test but it wasn't.  And then take paragraph 59,

13   just for example.  This deals with the NYPD's

14   desire to identify threats from a nuclear Iran.

15   Fair enough.  But the NYPD admits that most

16   Iranians in the United States are not Muslim, yet

17   they focus only on Shia Muslims.  And in that

18   program, as part of that program they focus on

19   Lebanese and Syrians not because they're from Iran

20   and would have loyalty, but because they're Muslim.

21   Those are all nonconclusory allegations.

22             With respect to Laird, Judge Fuentes,

23   I think you're right.  Ultimately it's a

24   generalized grievance case.  They can articulate no

1    injury.  The court stressed that at bottom their

2    claim simply stated is that they disagree with the

3    judgments made by the executive branch with respect

4    to the type and amount of information the Army

5    needs.

6              And in footnote seven the Supreme

7    Court stresses the plaintiffs in that case actually

8    admitted they were too courageous themselves to be

9    chilled and that they were standing in the place of

10   thousands of others less courageous.  Our

11   plaintiffs here of course allege direct personal

12   stake in the outcome.

13             The notion that there has to be

14   government compulsion for an injury is not in the

15   law.  Catholic League is a case that involved a

16   non-binding resolution criticizing the Catholic

17   Church and two Catholics in the jurisdiction had

18   standing.

19             Clapper is plainly distinguishable

20   because the subjective actions they took could not

21   be caused by the surveillance program because

22   surveillance was so utterly speculative.  Here all

23   our plaintiffs were either directly surveilled or

24   members of organizations that were subject to

1   surveillance.

2            The critical point is we have pled

3   what we need to plead to survive a motion to

4   dismiss.

5            THE COURT:  Did any of the individual

6   plaintiffs say that they were directly surveilled?

7            MR. AZMY:  Yes, your Honor.  The

8   mosques were, and the MSAs, were subject to and

9   were listed in NYPD reports.  And just to --

10            THE COURT:  The mosques, right.

11            MR. AZMY:  Yes.

12            THE COURT:  But the individual

13   plaintiffs.

14            MR. AZMY:  No.  The individual

15   plaintiffs do not.  They allege that they were

16   either members of mosques or the MSAs that were

17   surveilled.  So seven alleged direct surveillance

18   for membership within surveilled individuals.

19            And I just conclude by saying there is

20   certainly procedural error here that justifies

21   reversal.  But there's more as well.  The district

22   court, we believe, sanctioned overt discrimination

23   against a protected class and demeaned and

24   stigmatized an entire religion.

1          Thank you.

2          THE COURT:  Thank you.  Thank you to

3   both counsel for very comprehensive oral arguments.

4   We will take the matter under advisement.

5          I would ask counsel if you will get

6   together with the clerk's office and have a

7   transcript of this oral argument prepared with the

8   cost to be split evenly.

9          Thank you very much.  We'll recess for

10  ten minutes.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                        CERTIFICATION

2

3              I, JAMES DeCRESCENZO, a Registered

4    Diplomate Reporter, Certified Realtime Reporter,

5    Certified Shorthand Reporter of New Jersey, License

6    Number XI 00807, and Notary Public, hereby certify

7    that the foregoing is a true and accurate

8    transcript.

9

10             I further certify that I am neither

11   attorney nor counsel for, not related to nor

12   employed by any of the parties to this action; and

13   further, that I am not a relative or employee of

14   any attorney or counsel employed in this action,

15   nor am I financially interested in this case.

16

17

18

19   _____

20   James DeCrescenzo
     Registered Diplomate Reporter
21   Certified Shorthand Reporter Notary Public

22

23

24

**JAMES DeCRESCENZO REPORTING, LLC**